IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**GEORGE BANKS,**
  **Plaintiff,**

v.

**BANK OF AMERICA, N.A.,**
  **Defendant.**

§
§
§
§
§
§
§
§

**Case No. 05-CV-01688-HHK**

## PLAINTIFF'S OPPOSITION TO DEFENDANT BANK OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff George Banks ("Banks"), by and through the undersigned attorney, and respectfully opposes Defendant Bank of America's ("BOA" and "bank") Motion for Summary Judgment and Memorandum in Support (Doc. No. 26) (collectively "Motion").[1] Reasons in support of Plaintiff's opposition are more fully stated below.

### INTRODUCTION

Plaintiff's complaint is based upon four claims: violation of 42 U.S.C. § 1981, negligence, gross negligence, and negligent supervision and training. Defendant's Motion, while providing this court select excerpts from the record, paints a distorted and exaggerated portrait of the facts as they occurred, and fails to fulfill this Court's requirement under LCvR 56.1 to provide a statement of material facts not in dispute.[2] Notwithstanding the defect in Defendant's Motion, Plaintiff will show that there are genuine issues of material fact in dispute relative to each claim, and that Defendant's Motion should be denied, as this case should thus be decided by a trial jury.[3]

---

[1] All citations to the text of Defendant's Motion will refer to the Memorandum filed in support of its Motion for Summary Judgment.
[2] See Argument, § I.
[3] Defendant particularly concedes that there is a dispute on a fundamental fact question in its supporting memorandum: "...and it is disputed in this case whether Plaintiff produced two forms of acceptable identification to the tellers. ..." Def. Mot. at 15. This is a fundamental fact at issue in this case.

## FACTUAL BACKGROUND

George S. Banks is the owner, chairman and CEO of Sentry Security International, Inc. ("SSI"), headquartered in Washington, D.C. (*See* Pl.'s Dep. dated Nov. 6, 2003, relevant portions of which are attached hereto as Exhibit A and incorporated herein by reference, at 14-15.) He is an American citizen of African (Liberian) heritage. (*See id.* at 5-6.) He earned a bachelors degree in criminal justice from Rhode Island College. (*See id.* at 7.) He started SSI in July of 1999, and opened accounts at Bank of America (then Nations' Bank) in 1999, at its Silver Spring Branch. (*See id.* at 14-15;)

On Saturday, June 15, 2002, Banks went to the BOA branch at 1835 Columbia Road NW, Washington, D.C., to conduct a business transaction. (*See id.* at 20.) He sought to withdraw $1,000 from one account to transfer $700 of that $1,000 to another business account, and pocket the remaining $300. (*See id.* at 21-22.) At no time did this transaction involve an external check. (*See* Dep. of German Jordan dated Jul. 31, 2006, relevant portions of which are attached hereto as Exhibit B and incorporated herein by reference, at 74, 76.) The bank was fairly crowded. (*See* Dep. of Roxanna Fuentes dated Jul. 17, 2006, relevant portions of which are attached hereto as Exhibit C and incorporated herein by reference, at 34.)

On that date, he approached the Hispanic teller, Ms. Roxanna Fuentes ("Fuentes"), and simultaneously provided her with completed withdrawal and deposit forms, particularly since the transaction would have involved a simultaneous transaction of moving $700 to one account and withdrawing $300. (*See* Ex. A at 23.) He also gave the teller his Rhode Island driver's license. (*See Id.*) She then immediately requested an additional form of identification, pursuant to which he presented his Private Detective Agency License. (*See Id.*; *see also* Ex. C at 73.) That document, which featured a picture of him, stated: "Metropolitan Police Department Security Officers

Management Branch: Private Detective.[4]" Fuentes then started to process the transaction and was getting ready to give Banks $300, at which time a white and/or Hispanic female walked toward Fuentes and intervened. (*See* Ex. A at 23-24) Without reviewing any of Banks' documentation or asking him any questions, the intervenor stated that Banks did not look like he owned the business. (*See id.*) Based upon his recollection, Banks recalls that the intervenor did not appear to be either Black or African. (*See* Aff. of George Banks, attached hereto as Exhibit E, and incorporated herein by reference.) Banks then asked her what do owners of these types of businesses look like. (*See* Ex. A at 24.) The intervenor then stated that she was not going to honor his transaction.

At that time, Fuentes had processed the transaction, with the exception of giving Banks the requested $300[5]. According to Fuentes, Ms. Valentina Elebesunu ("Elebesunu"), the head teller, was the intervenor and purportedly advised Banks that a second form of identification was required. (*See* Ex. C at 22; 41:1-4).[6] However, Banks had already presented two forms of identification to the teller. (*See* Ex. A at 23: 5-19). He then told the intervening bank representative that the transaction was completed; that he had provided two forms of identification; and that he had three accounts at the bank: savings, checking and a CD account; and he did not know why he could not withdraw his money. (*See* Ex. C. at 38.) The intervenor then required the teller to reverse the transaction, which she did. (*See id.* at 72.)

At that point the teller returned Bank's two forms of identification and the transaction forms. Banks was shocked and insisted that the bank honor his transaction, but the teller refused.

_____

[4] A copy of the identification card presented to Defendant's teller is attached hereto as Exhibit D, and is incorporated herein by reference.
[5] A copy of the counter document filled out by Plaintiff and processed by Fuentes (as evidenced by the identification validation stamp and bank approval print stamp on the document itself) is attached hereto as Exhibit F, and is incorporated herein by reference. (*See* Ex. B at 72-75).
[6] Plaintiff does not concede that Elebesunu was actually the intervenor for reasons more fully articulated in the argument below. *See* Argument § II, D, 2, b.

According to the bank teller, Banks "wasn't that loud" when he was talking to her-- he was upset, but he was not "yelling." *Id.* at 43, 44.[7]

Almost immediately, an off duty D.C. Metropolitan Police Officer approached Banks while he was still in line and threatened to arrest him because he was insisting that the bank honor his transaction. (*See* Ex. A at 28.) The BOA branch manager, Mr. German Jordan ("Jordan"), a Hispanic person of Bolivian heritage, then came to the window and asked Banks to sit down at one of the nearby desks, which Banks did. (*See* Ex. B at 24.) However, Jordan never once sat down with Banks, never reviewed the transaction paper work, never reviewed Banks' credentials, and never asked him any questions. Jordan did speak with the teller for about 2-3 minutes. (*See* Ex. C at 50.) While Banks was seated at Jordan's Desk, the off duty police officer and BOA's security guard, a licensed special police officer (SPO), stood in very close proximity to Banks. (*See* Ex. A at 30.) Banks attempted to explain to the officers in a moderate and respectable tone of voice that this should not be happening to him since he was a customer and had money in the bank. (*See id.*) Within minutes, the manager came to where Banks had been waiting, and without attempting to explain anything, ordered the bank's security officer to "get him out of the bank." Ex. E. At that point, while in public view, Banks was handcuffed and forcefully removed from the bank and charged with disorderly conduct.[8] (*See* Ex. A at 41-42) He was taken to the Third Police District and held for five (5) hours. (*See id.* at 44.) He had never been arrested before this occasion. (*See*

---

[7] This testimony conflicts with Jordan's deposition testimony that he heard a customer ("Banks") screaming, shouting and yelling at teller line.

[8] Eyewitnesses to this event, including bank witness and employees, concur that the security officer was aggressively involved in the arrest process.

Ex. E.) He was required to retain legal counsel, and the criminal charges were subsequently not papered. (*See id.*)

According to the record developed in this case, at no time did the teller believe that there was potential fraud in what Banks was doing. (*See* Ex. C at 45:16-20.). Also, Banks cooperated with the teller and answered her questions about his account and at no time said anything that led her to believe that the accounts referenced by him were not his. (*See id.* at 46:7-15.) According to Fuentes, once a customer provided two forms of identification, her standard practice was to validate the transaction, which she did in this instance: bank transaction, "number 139". *Id.* at 67-68. Moreover, according to Fuentes, to the extent there was a misunderstanding between her and Banks, the dispute between them was "resolved" and she decided to process the transaction. *Id.* at 70:1-8.

The bank withdrawal slip for the transaction noted verification of identification per Banks' Rhode Island driver's license and Metropolitan Police Private Detective Identification. *See* Ex. F. A bank encryption on the back of the withdrawal sheet indicated that the teller had approved the transaction prior to her manager's intervention and reversal of the transaction. *See id.* This was the first time that Fuentes could remember being told by a head teller to reverse a transaction that she had approved. (*See* Ex. C at 75.)

Jordan admits that he instructed the bank's security officer to escort Mr. Banks out of the bank. (*See* Exh. B at 29:13-15.) Pursuant to Jordan's instruction, the security officer attempted to forcefully escort Plaintiff from the bank. (*See id.* at 29:16-18; 32:3-12.) He grabbed Banks by his "upper arm" and asked him to leave. *Id;* (*See also id.* at 33.) Within 10-20 seconds after that, the off duty D.C. Police Officer intervened, and both the security guard and the D.C. Police officer jointly escorted him out of the bank. (*See id.* at 34: 5-12.) According to Jordan, the bank's policy authorizes removal of a customer from the bank "only when the customer gets abusive and becomes

5

unreasonable." *Id.* at 55: 19-22; 56: 1-7. He claimed that Banks was abusive because he was screaming and yelling at the teller, which is contradicted by the teller's own testimony. (*See id.*)

Despite having irate customers many times before this, this is the first time that Jordan had asked security to remove someone from the bank. (*See id.* at 58:12-15.) In so doing, Jordan failed miserably to properly investigate the manner in that he did not then examine the transaction documents which Banks had presented to Fuentes. (*See id.* at 73: 1-13; 81:12-20.) Generally, a teller would not begin the encryption process involved in validation of the transaction without having received the required identification. (*See id.* at 79; 80:1-8.)

According to the teller involved in this incident, in an over-the-counter transaction in which a depositor requests less than $500 cash back, based upon the bank's policies and procedures, the bank only requires presentation of one form of ID. (*See* Ex. C, at 14-15.) If a depositor, as here, was

---

[9] In its Motion, Defendant fails to represent to this Court the entry of an agreed upon consent order and agreement regarding Defendant's production of these documents. Contrary to its representations, these policies and procedures are part of this record, and are attached hereto as Exhibit G (under seal) and incorporated herein by reference.

withdrawing $1,000, he or she would be required to present two forms of identification. (*See id.* at 19: 11-21.) If a depositor, as here, was withdrawing $300 and transferring $700 from one account to another, only one form of identification would be required. (*See id.* at 20: 1-4, 9-14).

Furthermore, there was a video camera which recorded the incident with Plaintiff at the bank. (*See id.* at 64.) There was a bank investigation, and in the process, Defendant sent a copy of the video was to its national corporate security office. (*See* Ex. B at 49:1-16). The bank manager observed parts of the video with Bonnie Sobolewski of Defendant's corporate security office. (*See id.* at 47:1-22; 48:1-10). But the Defendant maintains that it does not presently have a copy of the video.

According to one teller manager, there have been prior instances in which Hispanic and white customers have raised their voices and become angry with the teller. (*See* Dep. of Valentina Elebesunu dated Jul. 17, 2006, attached hereto as Exhibit H and incorporated herein by reference, at 65-66.) However, she had never observed the involvement of the bank's security guard and the execution of an arrest of any of these individuals. (*See id.*) Further, based upon her observations, she admits that Banks did not do anything to Ms. Fuentes that justified his arrest. (*See id.* at 67.)

## STANDARD OF REVIEW

Defendant BOA asserts that it is entitled to summary judgment as a matter of law. As such, defendant bears a heavy burden of overcoming all favorable inferences to which the plaintiff is entitled. Summary judgment should be granted only if "there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is settled law that the moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Richardson v. National Rifle Association,* 871 F. Supp. 499 (D.D.C. 1994). Thus, BOA is entitled to summary judgment

only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

Since all inferences drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party, the defendant's burden is substantial. *Washington Post Co. v. U.S. Dept. of Health and Human Services*, 865 F.2d 320, 325 (D.C. Cir. 1989). As noted by the Court in *Washington Post*, *supra* at 325,

> "Summary judgment is appropriate only in circumstances where the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L.Ed.2d. 202, 106 S.Ct. 2505 (1986). In deciding a motion for summary judgment, the district court is obligated to view the available evidence in the light most favorable to the nonmoving party. *Adickes, supra.; Popham, Haik, Schnobrich, Kaufman & Doty, Ltd. v. Newcomb Securities Co.*, 243 U.S. App. D.C. 43, 751 F.2d 1262, 1263 (D.C. Cir. 1985) ("Any doubt is to be resolved against the moving party.") The Supreme Court has recently made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. If a genuine dispute does exist over a material issue, then parties should be given the opportunity to present direct evidence and cross-examine the evidence of their opponents in an adversarial setting."

## ARGUMENT

I.  **Defendant's Motion Fails to Provide a Statement of Material Facts Not In Dispute As Required Under LCvR 56.1; Therefore, Any Purported Statement of Material Facts Offered in Defendant's Motion Should Be Stricken, and Defendant's Motion Should Be Denied.**

Defendant's Motion fails to fulfill this Court's requirement under LCvR 56.1 to provide a statement of material facts not in dispute. Under this Court's Local Rules, a party moving for summary judgment must provide "a statement of material facts as to which that party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement." LCvR 56.1. A proper submission under LCvR 56.1 must specify the material facts and

8

direct the court and the non-movant to those parts of the record which the movant believes support the statement, thereby isolating the material facts and distinguishing disputed from undisputed facts. *Burke v. Gould*, 286 F.3d 513, 518 (D.C.Cir.2002). Due to the nature of summary judgment and the rule's purposes, before the court may consider disposition of a case in such a manner, it must make certain that the moving party is in full compliance with LCvR 56.1, as failure to file a statement of material facts in accordance with the rule may be fatal to its position. *Gardels v. Central Intelligence Agency*, 637 F.2d 770, 773 (D.C.Cir.1980) (reversing summary judgment granted to a moving party whose statement of material facts included with its motion failed to specify material facts, and merely incorporated entire affidavits and other materials without reference to particular facts supporting the view that no genuine issues of material fact existed.)

Defendant's failed to file a proper statement of material facts in accordance with LCvR 56.1. Instead, it includes as part of its Motion sections entitled "Undisputed Facts" and "Plaintiff's Factual Allegations," both of which hardly suffice as "a statement of material facts" as to which Defendant contends there is no genuine issue. *See* Def's. Mem. at 3-10 (Doc. No. 26). Rather than setting out factual statements in corresponding numbered paragraphs and supporting each statement through citations to the record, as required by LCvR 56.1, Defendant's "Undisputed Facts" and "Plaintiff's Factual Allegations" sections fail to specify material facts, and repeatedly blend factual allegations with legal argument, and undermine the purpose of the Rule which is to assist the Court in quickly determining which facts are actually in dispute and which facts are without support. *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C.Cir.1996). Further, these "fact" sections offered in Defendant's Motion merely incorporate deposition testimony and other materials without reference to particular facts supporting the view that no genuine issues of material fact exists. Accordingly, Defendant cannot meet its burden in showing that there is no

9

dispute of material fact, and therefore its Motion should be denied.

II.    **Plaintiff Has Stated A Claim Upon Which Relief May Be Granted, And Thus, Defendant's Motion Should Be Denied.**

   A.    **Genuine Issues of Disputed Material Facts Exist Regarding Plaintiff's Negligence Claim.**

In the District of Columbia, as elsewhere, "[t]o establish negligence a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *District of Columbia v. Beretta, U.S.A., Corp.*, 847 A.2d 1127, 1135 n. 2 (D.C.2004) (*quoting District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C.2001)) (quotation marks and alteration omitted).

It is fundamental and well-settled that a business invitor has a duty of care to its patrons while present on its premises. *See*, e.g., *Seganish v. District of Columbia Safeway Stores, Inc.*, 406 F.2d 653, 655 (D.C. Cir. 1968) (a business invitor's "duty is to exercise reasonable care to keep his place of business safe for the customer using it"); *Smith v. Safeway Stores, Inc.*, 298 A.2d 214, 216 (D.C.1972) (discussing *Seganish*). In the District of Columbia, under *Viands v. Safeway Stores*, and its progeny, a business's duty extends to protecting its customers from foreseeable harm caused by third parties at its "exit doorway and the approach thereto." 107 A.2d 118, 121 (D.C.1954).

In *Viands*, a customer leaving a grocery store through its only exit tripped over a small wagon that had been left on a public sidewalk by some young boys. *Id.* at 119. Though not store employees, the boys customarily gathered outside the store to offer delivery services for a fee. *Id.* The trial court instructed the jury that "there can be no duty imposed on the defendant in this or any other case of this type with respect to space over which the defendant has no control and no legal opportunity for control." *Id.* The Court of Appeals disagreed, concluding that the trial court stated too narrow a view of a business's duty of care. *Id. Viands* found persuasive the Restatement (First)

of Torts § 348 (1939), which *Viands* summarized as follows: "an invitor is liable to a business invitee for injury caused by the accidental negligence or intentionally harmful acts of third persons if the invitor by the exercise of reasonable care could have (a) discovered that such acts were being done or were about to be done, and (b) protected the invitee by controlling the conduct of the third persons or giving a warning adequate to enable him to avoid the harm." *Id.* at 120-21 (emphasis in original).



Despite this policy, Plaintiff submits that Fuentes initially requested that he present two forms of identification, not one. He complied and presented the requested two (2) forms of identification. (*See* Ex. A at 23: 3-14.) After all, Plaintiff was a bank depositor, albeit with a different branch, and should have been treated in accordance with the bank's policies and procedures. The bank should have processed his transaction once Banks presented appropriate identification. These policies and Plaintiff's business invitee status create the legal framework to establish Defendant's duty owed to Plaintiff. *Novak v. Capital Management and Development Corp.* 452 F.3d 902, 915 (D.C. Cir. 2006).

Plaintiff asserts negligence against the Defendant as a business invitee and based upon its stated policies regarding approval and processing of financial transactions. There was no legitimate reason for the Bank to justify not processing his transaction. Likewise, there was no reason to ask Banks to leave and to invite the security guard to assist in that process. The bank enjoyed a duty to protect its depositors, including Banks as an invitee, from harm and to follow its customer service and transaction approval policies. In this case, the bank at each level— the teller, the head teller, and the bank manager— exhibited absolute disdain for its polices and treated Plaintiff harshly and adversely, simply because he insisted that there was no legitimate reason for the bank not to honor his identification and complete his transaction.

Furthermore, the evidence in this case is controverted as to why the transaction was not concluded; it certainly was not as Defendant contends, based upon the teller's determination that Plaintiff's produced identification was unacceptable. Indeed, the record is rather revealing on this factual question and shows that Fuentes did in fact approve Plaintiff's transaction, and a note on the pertinent withdrawal form references two (2) forms of identification shown by Plaintiff. (*See* Ex. F). Additionally, Fuentes has admitted that only one form of identification was required for this particular type of transaction. (*See* Ex. C at 20: 1-4, 9-14.) (If a depositor withdrew $300 and transferred $700 of that from one account to another, only one form of identification would be required).

On the question of foreseeability, the D.C. Court of Appeals tends to follow a "sliding scale" whereby "[i]f the relationship between the parties strongly suggests a duty of protection, then specific evidence of foreseeability is less important, whereas if the relationship is not of a type that entails a duty of protection, then the evidentiary hurdle is higher." See *Workman v. United Methodist Comm. on Relief of Gen. Bd. of Global Ministries of United Methodist Church*, 320 F.3d 259, 264 (D.C.

12

Cir.2003). The duty imposed, therefore, is one of degree: the closer the relationship between the plaintiff and defendant– that is, the more control the defendant exercises over the plaintiff– the more exacting the defendant's duty to provide for the plaintiff's well-being becomes and, accordingly, the less necessary becomes "specific evidence of foreseeability." *Id.* at n. 1. At one end of the scale– requiring less foreseeability– is a custodial relationship such as between a school and a student, see *District of Columbia v. Doe,* 524 A.2d 30, 33 (D.C.1987), while, at the other end of the scale– requiring specific foresee ability– is no relationship between the parties. In this case, the relationship is a close one, between a bank entrusted with its customer's money and a bank depositor who is also a business invitee.

Defendant's bank manager was fully aware that there was a dispute in process at the teller's window. At some point, the dispute between Banks and the teller was "resolved," and Fuentes decided to process the transaction. Ex. C at 70:1-8. Fuentes also testified that Plaintiff was neither loud nor yelling at the time that she handled the transaction. At the time that Plaintiff spoke with the bank teller, he "wasn't that loud;" Plaintiff was upset, but he was not "yelling." *Id.* at 44. In contrast, the bank manager testified that the customer was "abusive to the bank teller" *when she was doing the transaction,* (Ex. B, at 62: 1-4; 67[10]) and that he never produced a second form of identification. *Id.* at 63:17-19. (Emphasis added). In addition, there was an off-duty D.C. police officer on the scene who was not fully apprised of all of the facts and certainly not the details of Plaintiff's business dealings with the bank, nor Defendant's policies and procedures for conducting certain transactions. (*See id.* at 66: 9-12; 67: 8-12). Hence, Jordan was fully aware that the police officer who was already anxious could misconstrue the facts and arrest Banks for appearing to create

---

[10] The court should note that the incident involving Plaintiff was in fact recorded on a video tape; the Defendant now claims that it did not retain a copy of the tape. (*See Ex.* C at 46-47, 49, 84, 85.)

a disruption whereas in reality he was legitimately arguing that the bank had violated its policies and his rights. Defendant attempts to place the blame for the arrest exclusively on the D.C. police officer who actually effectuated the arrest. In so doing, Defendant ignores Jordan's sworn testimony that he called security after he concluded that he could not deal with the customer anymore. (*See id.* at 55). Jordan also testified that Banks was being abusive and did not calm down. (*See id* at 59).

Further, Jordan admits that he instructed the security guard on duty at the bank to "take Banks out of the bank." *Id.* at 29. As a result, the security guard initiated this process. *Id.* Notably, this instruction to security occurred without the Bank manager ever examining the transaction documents (marked herein as Exhibit F) or listening to Plaintiff's version of the incident. Had the bank manager merely reviewed the bank transaction documents and the progress thereof, he would have learned that the transaction had been approved and subsequently reversed. He also would have been able to verify whether, at that point in time, Banks had in his possession the required two forms of identification. But Jordan never asked Banks any questions. (*See* Ex. B at 36:3-4). At his insistence, the security guard asked Banks to leave and actually used force in that process by placing a hand on Banks' "upper arm. *Id.* at 32. When asked why he told the security guard to put Banks out, Jordan stated:

> "Because I knew that I wasn't going to get nowhere. He wasn't interested in talking to me or trying to solve the problem. He was just fighting and arguing and being disruptive."[11]

(*Id.* at 35.)

Jordan's negligent action and order to the security guard triggered the involvement of the D.C. police officer and caused Plaintiff to be arrested. (*See id.* at 33.) Contrary to Defendant's

---

[11] The manager testified that Banks never had a conversation with him. (Id. At 35).

factual version, bank employees conclude that the security guard and the police officer jointly took Banks out of the bank. (*See id.* at 34: 5-9; *also* Dep. of German Jordan dated Jan. 7, 2004, attached hereto as Exhibit I and incorporated herein by reference, at 49.) The security guard actually assisted the officer in executing the arrest and handcuffing Banks. (*See* Ex. I at 49: 17-22; 50:11-12: "Both of them were pulling his hands back and Officer Tubbs just handcuffed Banks.") *Id.* It was only after the police took Banks outside, (not inside) that the Officer stated: "[t]his is not a bank matter anymore, it's a police matter." Ex. B at 35: 8-10. Therefore, up until that point, Jordan could have taken steps to ensure Plaintiff's safety, and to more completely investigate his customer problem. At no time, however, did he consider the possibility that Banks' complaint had any credence. For him, Banks was the proverbial "invisible man."

Plaintiff's negligence claims are based upon the bank teller, head teller and bank manager's actions. Each failed to properly handle a simple transaction after Plaintiff produced appropriate identification, and each was hostile and adverse toward Plaintiff, resulting in Plaintiff's being arrested, charged and prosecuted for certain criminal offenses for the first time in his life. Although Jordan fully appreciated the D.C.'s police officer's ongoing interest in the matter, he never did anything to explain to the officer that the customer was within his rights in protesting the bank's manner of handling his transaction. At no time did Plaintiff threaten or assault anyone.

Based upon its own testimony, Defendant deviated from its own policies and procedures and took no steps whatsoever to protect Plaintiff from the possibility of arrest. Jordan conceded that he would have handled a customer with a "legitimate complaint" differently, even if that customer was upset about the manner in which he was being treated, and even if that customer was screaming and yelling about a complaint. *Id.* at 56-57. Then, prey tell, why did he handle Plaintiff in the manner that he did? He also testified that he was there to "help" his customers, but in this case he only

15

helped to humiliate and embarrass Plaintiff and to cause his arrest.

At no time did Jordan attempt to secure the pertinent documentation related to the transaction; at no time did he request that Plaintiff produce a second form of identification, nor did he ask Plaintiff a single question. How could he possibly help Plaintiff if he did not communicate with him?

Defendant's conclusion that the bank's liability would have to be related to the teller's decision not to process his $1,000 transaction is an oversimplification of the issue at hand and a trivialization of its own policies and procedures and Plaintiff's business invitee status. Defendant's actions were the cause-in-fact and proximate cause of Plaintiff's being put out of the bank and being arrested for disorderly conduct related to his protesting that the bank violated his contractual and civil rights.

Defendant's argument that the bank did not have a master-servant relationship over the security guard must also fail. Indeed, Jordan's testimony is that he ordered the security guard to do a task related to Plaintiff, and the security guard complied. Surely, this creates an inference in Plaintiff's favor that the store manager had certain supervisory authority over the guard, as he did exactly what Jordan ordered him to do in this instance.

There are genuine issues of material fact which demonstrate the existence of the elements which prove Plaintiff's claim. Accordingly, disposition of this claim under the doctrine of summary judgment would neither comport with the law nor with fairness and justice.

**B.    Genuine Issues of Material Fact Exist Regarding Plaintiff's Negligent Supervision Claim.**

Defendant submits that Plaintiff cannot establish the applicable standard of care to maintain a claim of negligent supervision because the legal basis of Plaintiff's claim is contained in bank

policies and procedures[12], "copies of which he does not have." Def.'s Mot. at 18.  However,

Defendant did produce copies of its policies and procedures to Plaintiff, but due to circumstances

beyond both Plaintiff and Defendant's control (more than likely caused by an internal mistake within

the postal service), copies of these documents were not received by Plaintiff until February 20, 2007.

Said documents are attached hereto as Exhibit G, and are incorporated herein by reference.  These

policies and procedures, together with other evidence in the record, show that Plaintiff has stated a

claim upon which relief can be granted against Defendant for negligent supervision.[13]

An employer conducting a business activity through an employee may be liable for harm

resulting from an employee's conduct if he is "negligent or reckless in the supervision of the activity;

in giving improper or ambiguous orders; in failing to make proper regulations; or in permitting, or

failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or

agents, upon premises or with instrumentalities under his control." *Tarpeh-Doe v. U.S.*, 28 F.3d 120,

123 (D.C. Cir. 1994).  To establish a claim of negligent supervision, a plaintiff must present evidence

'which establishes the applicable standard of care, demonstrates that this standard has been violated,

and develops a causal relationship between the violation and the harm complained of.' *Morrison v.*

*MacNamara*, 407 A.2d 555, 560 (D.C.1979) (quoting *Kosberg v. Washington Hosp. Center, Inc.*,

---

[12] In his deposition, the bank manager elaborates on the banks policies and procedures which he and the tellers are trained by the bank to follow:

    ...

    Q: Are you familiar with the policies and procedures of the bank regarding customer service?

    A: Yes.

    Q: And are they codified or memorialized in some type of publication?

    A: Yes. ... guidelines that we have as far as customer service.  You know, policies and procedures we follow. ...

    Q: ... What are you referring to when you're talking about the policies and procedure?

    A: Policies and procedures, meaning like, for example, if a customer would come to the bank, ... procedures that we follow as far as how to handle the transaction.

    ...

  (Ex. B at 7-9.)

[13] Plaintiff concedes its negligent training claim.

394 F.2d 947, 949 (D.C.Cir.1968)).

Defendant's Teller Operations Manual outlines the policies and procedures that a teller is to follow when a bank customer enters the bank to complete a transaction, and provides the applicable standard of care in Plaintiff's negligent training and supervision claim. (*See* Ex. G.) ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ Instead the teller supervisor refused to allow Plaintiff's transaction to be processed, claiming the ID he presented was insufficient and that he did not look like he owned the business.

Even if the ID presented was questionable in the mind of the supervisor in accordance with the bank's own policies and procedures, she could have verified Bank's identity by comparing the signature on the transaction document to the bank account signature card on file. (*See id.* at BOA1-019.) However, rather than exhaust an alternative outlined in the procedures to verify Banks' identity, the intervenor simply refused to process Banks' transaction and refused to require Fuentes to follow bank procedures. Rather than attempt to assist the customer in resolving his issue with Fuentes, the intervenor simply called bank security and drew further attention to the Plaintiff thereby suggesting his impropriety and/or criminality, which lead to his arrest on a bogus disorderly conduct charge. It is for the same reasons that there is a breach of duty in the negligence claim, that there is a

18

breach of the duty to properly supervise in this claim.

**C.    Genuine Issues of Material Facts Exist as to Plaintiff's Gross Negligence Claim.**

To establish a claim of gross negligence, a plaintiff must prove the same elements as ordinary negligence, as well as be able to show "such an extreme deviation from the ordinary standard of care to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights... of others." *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C.1997) (citing *Andrews v. Wilkins*, 934 F.2d 1267, 1272 (D.C.Cir.1991)).

Consistent with Defendant's own policies and procedures, because Plaintiff maintained two deposit accounts, Plaintiff was classified as a "bank customer." *(See* Ex. G at BOA1-012.)

In beginning his transaction, Plaintiff presented the teller with a counter document to withdraw $1000 from his company account, along with his valid, unexpired driver's license issued from within the United States. When the teller asked him for a secondary form of ID, he produced his photo-ID issued by the District of Columbia Metropolitan Police Department Security Officers

Management Branch, a city governmental agency. The teller then processed the transaction and was about to hand Plaintiff the money when the teller supervisor walked over to her and stopped her. Although the secondary ID offered by Plaintiff to confirm his identity met all of the requirements outlined in Defendant's own policies and procedures, the teller supervisor told Plaintiff that the secondary form of ID presented was not acceptable, and reversed the teller's transaction.[14] Rather than proceed with Plaintiff's transaction, per Plaintiff's account agreement with the bank, Defendant refused to process Plaintiff's transaction, called bank security, and caused Plaintiff to be arrested, which caused him to suffer physical and emotional injuries.

Gross negligence is that which shocks fair-minded men. *Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley*, 999 F. Supp. 34, 58 (D.D.C. 1998). This standard includes conduct held to be so extreme as to connote some sort of bad faith. *Walker*, 689 A. 2d at 44-45. In this case, a bank depositor was refused the right to make a deposit and withdrawal, despite being a bank customer with money in his accounts, was then isolated and castigated without any communication or management inquiry, and was forcefully evicted from the bank and arrested. These are actions which a jury could reasonably find to be outrageous and abhorrent. Defendant refused to process Banks transaction because a bank supervisor claimed that he did not look like he owned the business, not because he did not look like the picture on the IDs presented. (*See* Ex. A at 23-24.) Defendant's employees make varied and inconsistent arguments, including Plaintiff's secondary form of ID was not acceptable. (*See* Ex. B at 37-38.) If Defendant refused to process Plaintiff's transaction based upon the fact that he did not look like he owned the business, then the only question that should be left to the jury is whether Defendant's refusal to process the transaction because of Plaintiff's

---

[14] Defendant claims that Banks never produced two (2) forms of identification.

outward appearance amounted to an extreme deviation from the ordinary standard of care (as outlined in Defendant's own policies and procedures adopted to serve its bank customers) to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights of Plaintiff. These contentions present an issue of material fact which a trier of fact should resolve.

### D.    Genuine Issues of Material Facts Exist as to Plaintiff's 42 U.S.C. § 1981 Claim.

The matter *sub judice* involves a contract discrimination claim under 42 U.S.C. § 1981, which provides in part that:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

"[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" *Id. at* § 1981(b). Section 1981, however, as amended by the Civil Rights Act of 1991, specifically provides that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, term, and conditions of the contractual relationship." *Id.* The legislative history of the Civil Rights Act of 1991 reveals that in amending section 1981, Congress reaffirmed the view that section 1981 is "a critically important tool used to strike down racially discriminatory practices in a broad variety of contexts." H. Rep. No. 102-40, pt. II, at 36 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 729 (Report of House Judiciary Committee on Civil Rights Act of 1991). Pursuant to its expansive view of section 1981, Congress intended the amended language in section 1981-in particular, the use of the phrase "benefits, privileges, terms and conditions" -to be an "illustrative

rather than exhaustive" list of the protected facets of the contractual relationship. *See* H. Rep. No. 102-40, pt. I, at 92 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 630 (Report of House Education and Labor Committee on Civil Rights Act of 1991); H. Rep. No. 102-40, pt. II, at 37 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 730-31 (Report of House Judiciary Committee on Civil Rights Act of 1991). The illustrative language was "intend[ed] ... to bar all race discrimination in contractual relations." H. Rep. No. 102-40, pt. I, at 92; H. Rep. No. 102-40, pt. II, at 37; cf. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (finding that the use, in section 703 of Title VII of the Civil Rights Act of 1964, of the phrase "benefits, privileges, terms and conditions of the contractual relationship" "evinces a congressional intent to strike at the entire spectrum of disparate treatment")). The objective of this statue was to protect blacks and other minorities from private discrimination.

The burden of proof in this case, as juxtaposed with Section 1981 employment discrimination cases, is distinct. In order to establish a prima facie case of racial discrimination, under *McDonnell Douglas*, a plaintiff must establish that (1) he is a member of a protected class, (2) he sought to enter a contractual relationship with the defendant, (3) he met the defendant's ordinary requirements to pay for and to receive services ordinarily provided by the defendant to other similarly situated customers, and (4) he was denied the opportunity to contract for goods or services that were otherwise afforded to persons outside of the protected class. *Williams v. Staples, Inc.* 372 F.3d 662, 667 (4th Cir.2004). In cases where there were no other customers with whom to compare the treatment that a plaintiff received, a plaintiff may also satisfy this fourth element by showing that he received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable. *Id.* at 668, n. 5; *see also Dobson v. Cent. Carolina Bank & Trust Co.*, 240 F.Supp.2d

22

516, 520 (M.D.N.C.2003); *Callwood v. Dave & Buster's, Inc.*, 98 F.Supp.2d 694, 707 (D.Md.2000)

(of note, *Callwood* has been followed by the Second Circuit in *Lizardo v. Denny's, Inc.*, 270 F.3d 94

(2001), as well as the Sixth Circuit in *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872

(2001)).[15]

---

[15] The judge's reasoning in *Callwood* may be helpful to this court in determining the extent to which it will employ the *Callwood* proof standard. On this issue, the judge concluded as follows:" .... that in order to make out a prima facie case under the circumstances of these cases, plaintiffs must show the following: (1) they are members of a protected class; (2) they made themselves available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and (3) they did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services, *and/or* (b) they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable. Cf. *Edwards & Associates, Inc.*, 84 F.Supp.2d at 1191-92. The first and second elements are consistent with standard formulations of the prima facie case in the better-reasoned cases. See *id.* Likewise, subpart 3(a) of the above test invokes traditional "similarly situated" analysis, and recognizes that the point of comparisons between plaintiffs within the protected class and similarly situated persons outside the class "is this: because the classes are similarly situated in most relevant respects except their protected status (e.g., gender or race), there arises a rational inference of discrimination on the basis of that status." *Myers v. Hose*, 50 F.3d 278, 284 (4th Cir.1995) (employment discrimination under Americans with Disabilities Act). The formulation must be qualified by the Fourth Circuit's understanding" of the "reality that the comparison will never involve precisely the same set of ... [conduct] occurring over the same period of time and under the same sets of circumstances." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1107-11 (4th Cir.1985). This understanding is particularly resonant in the public accommodations context, given the extraordinarily transient nature of the interpersonal contacts between patrons and service employees.

....

As noted above, often in the retail context, evidence of the retailer's conduct towards similarly situated patrons outside the protected class is difficult, if not impossible, to discover. Accordingly, subpart (3)(b) recognizes that even in the absence of similarly situated comparators outside the protected class, "markedly hostile" behavior towards members of the protected class may, under the circumstances of a particular case, give rise to a rational inference of discrimination sufficient to support a prima facie case. Factors relevant to the determination of whether conduct is "markedly hostile" are whether the conduct of a merchant or her agents is (1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination. *Callwood, supra.* Thus, subpart (3)(b) eschews the requirement of serendipity inherent in a crabbed application of a "similarly situated" analysis by considering normative factors which are commonly understood to influence the conduct of merchants and their agents in a profit-motivated enterprise to render agreeable service to paying customers. Evidence of a merchant's or her agent's gross deviation from business norms and financial considerations in conduct towards members of the protected class offers sufficient alternative circumstantial indicia of discriminatory intent to satisfy the function of the prima facie case. To the extent that evidence of similarity between protected and non-protected members is accessible, this evidence, while not required, retains utility under subpart (3)(b) by exposing arbitrary behaviors towards members of the protected class, thereby supporting the conclusion that the conduct of a particular public accommodations operator or her agent is "markedly hostile." If the plaintiffs successfully establish the elements of their prima facie case as described above, then the burden of production rests upon defendant to produce evidence of one or more legitimate non-discriminatory reasons for the adverse treatment accorded to plaintiffs. The Callwoods and Gilberts must then produce sufficient evidence to establish the existence of a genuine issue of material fact that Dave & Buster's' proffered reasons are merely pretexts for intentional discrimination. *See Evans v. Holiday Inns, Inc.*, 951 F.Supp. 85, 89 (D.Md.1997) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). A pretext exists only if the Callwoods and the Gilberts show both that Dave & Buster's' proffered reason for disparate treatment is false and that racially motivated discrimination was the actual reason for the disparate or markedly hostile treatment. See *Evans*, 951 F.Supp. at 89 (citing *Jiminez v. Mary Washington College*, 57 F.3d 369, 378 (4th Cir.) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113S.Ct. 2742, 125 L.Ed.2d 407 (1993))).

1.    **Plaintiff Is a Member of a Protected Class.**

It is undisputed that Plaintiff is an American of African heritage and a member of a protected class for purpose of 42 U.S.C. § 1981 protection.

2.    **Defendant Intentionally Discriminated Against Plaintiff.**

The ultimate determination of "whether there was intentional discrimination against a protected class is considered a question of fact"; Plaintiff can satisfy its burden to show that BOA discriminated against him on the basis of race "either directly by proving defendant acted with a discriminatory motive" or "directly by showing that [defendant]'s proffered reasons are pretextual." *See Elmore v. Caspian, Inc.,* 58 F.3d 525, 530 (10th Cir. 1995). Plaintiff's showing of pretext constitutes evidence which allows a jury to infer discrimination.

In this case there is direct and indirect evidence of discrimination.

a.    **Defendant intentionally discriminated against Plaintiff.**

This is a classic consumer discrimination case, even under non-*Callwood* traditional standards of proof. Plaintiff was a bank customer with three accounts at the bank, and with money in these accounts. Plaintiff provided two valid forms of government identification to the teller sufficient in the first instance to secure her comfort level that the account belonged to him and that there was no fraud afoot. *See* Exs. D and F. Plaintiff answered all of the teller's questions when he was approached and told that he did not look like he owned his business. At that point, the climate changed in the bank and a cloud of hostility emerged against Plaintiff, which subjected him to a markedly hostile and adverse environment. His transaction was reversed without explanation. The bank refused to give him any money. The bank management sanctioned the bank supervisor's refusal and then further delayed the transaction by inviting him to be seated under the watchful and close supervision of bank security guard. Then the bank manager in a micro-investigative mode

24

spoke briefly with bank staff, but totally ignored Plaintiff, failing miserably to dignify his presence with a mere question or review of his identification. An apology was not even a remote possibility. Rather, he ordered his bank security to "get him out of here," as if he had no right to be there and had committed a crime. Clearly, the treatment accorded Plaintiff was markedly hostile. But it was also different than the treatment accorded the bank's white and Hispanic customers.

The facts show a blatant illegal double standard in the form and content of BOA's treatment of Plaintiff. The Bank manager was an Hispanic, the teller at issue was an Hispanic, and Plaintiff submits that the intervening bank supervisor was also an Hispanic. According to BOA's head teller, white and Hispanic customers have from time to time become upset with tellers. (*See* Ex. H at 65: 21-22 and 66: 1.) Further, whites and Hispanics have also from time to time raised their voices with tellers. *Id*. at 66:2-4. But, at no time has the bank security guard handcuffed a white or Hispanic depositor or customer inside the bank. *Id*. at 66:5-8. Nor had the security guard handcuffed a white or Hispanic depositor who was loud or upset with a teller inside the bank or who was having a dispute with the teller. *Id*. at 66: 9-16. In fact, Elebesunu admits that Banks did not do anything when he was talking to either her or Fuentes that she thought was so wrong as a customer that he should have been arrested. (*See id.* at 68: 2-12.)[16]

Clearly, BOA treated Plaintiff differently than it treated its other non-black depositors. Based upon these facts, Plaintiff meets his burden of proof on this element and raises sufficient factual disputes for jury consideration.

---

[16] Neither Elebesunu, Jordan or Fuentes were disciplined for their involvement in the Banks' transaction and subsequent arrest. Ex. H at 69: 9-18. Moreover, Elebesunu testified that to her knowledge there was no investigation of this incident, and that other than counsel, no one in the bank management or the corporate hierarchy ever inquired about what happened on that day to Banks. (*See* Ex. H at 70: 2-5.)

**b.** **Defendant Did Not Have a Legitimate Non-Discriminatory Reason for Its Racially Discriminatory Treatment of Plaintiff.**

At issue is the bank's refusal to complete Plaintiff's transaction, the imposition of a double-standard and the forced removal of Plaintiff from the bank because of Plaintiff's protest, which resulted in his arrest. The bank's proffered reason for not processing Plaintiff's transaction, that Banks failed to produce sufficient identification, lacks credence.

As the Tenth Circuit noted:

> [A] showing of pretext is evidence which allows a jury to infer discriminatory intent. Consequently, because a jury may find illegal discrimination upon nothing more than a prima facie case and pretext, such a showing at the summary judgment stage is sufficient to get the case to the jury.

This conclusion flows directly from the Supreme Court's analysis in *St. Mary's Honor Center*, where the Court observed that 'rejection of the defendant's proffered reason will permit the trier of fact to infer the ultimate fact of intentional discrimination." 509 U.S. 502, 113 S.Ct. 2742, 2749. This is precisely the case here.

Defendant's first argument is that the head teller, Elebesunu, was involved in this transaction and further, that she, like Plaintiff, is of African heritage. Defendant also notes in its motion that Plaintiff has alleged that the bank teller who intervened appeared to be white and/or Hispanic. Def.'s Mot. at 5, n. 2.[17] Plaintiff initially subscribed to Defendant's now questionable representation that Elebesunu was the individual who intervened in the Banks-Fuentes transaction. However, close scrutiny to the record raises significant doubts in this regard. A comparison of both Elebesunu and Fuentes' depositions reveal major and almost irreconcilable contradictions. Elebesunu testified in her deposition that she was the head teller, that it was a busy Saturday afternoon, and that she nonetheless listened to everything that was going on. She testified that she heard Banks' discussion

about "the check" and the teller saying that the transaction required two IDs. (*See* Ex. H at 28.) She further stated that she was serving a customer at the time and was seated next to Ms. Fuentes. (*See id.* at 29.) There was, however, no "check." Ex. B at 74, 76. Elebesunu also testified that she "went over there to help [Fuentes] out and to see exactly what was going on." She stated that Fuentes, at that time, only showed her one counter document (i.e., a withdrawal slip, but not a deposit slip). Ex. H at 28-29. She also says that she asked Banks whether he had any other form of identification, and he said "no." *Id.* at 29:8-10.

Elebesunu also testified that she heard Fuentes state to Plaintiff that "we can't cash the check, we need two IDs to cash a check." *Id.* at 31:20-22 and 32:1-8.[18] She also stated that she did not have any communication with Fuentes outside of the presence of Banks. (*See id.* at 39:11-14.) Most glaringly, Elebesunu stated that she had no knowledge as to whether Fuentes had approved the transaction prior to her involvement and yes, the penultimate contradiction, that she did *not* tell Fuentes to reverse the transaction:

> ....
>
> Q. Did you ever tell her to reverse the transaction?
>
> A. No. If she cashed it, I did not see that part. When I was there it was because he was raising his voice and I came around to give her that support that one ID is insufficient. ...
>
> ....

(*Id.* at 40:7-9.)

> ....
>
> Q. Okay. And did you ever see Ms. Fuentes validate a check?

---

[17] Defendant appears to suggest that one cannot be both White and Hispanic. It is elementary that Hispanic is not race.

[18] Despite that she could hear Plaintiff, she did not recall him using any profanity. Ex. H at 35. Compare Fuentes Dep Testimony: "Because he was very rude and upset and he was cursing at me and that's when the teller coordinator came to me, to my window, and I explained to her what was going on." Ex. C at 37: 10-13.

A. I did not see.

Q. Do you know if she ever validated it or tried to validate it?

A. I honestly do not know.

...

(*Id.* at 62:15-20.)

It is indisputable that Fuentes had processed and approved the transaction. (*See* Ex. F.) The person who intervened indisputably reversed the transaction. Thus, Elebesunu should have had personal knowledge of both the approval and the reversal, however, she did not. As such, she put not only her credibility as to the factual occurrences at issue, but also her credibility as to whether it was actually her who intervened in the transaction, or someone else.[19]

Elebesunu has testified that she did not instruct Fuentes to make that reversal. A comparison of Fuentes' pertinent deposition is instructive:

....

Q. And you were asking him questions?

A. Yes.

Q. And when you asked him questions, did he answer your questions?

A. Yes

Q. Okay? Did he say anything to you that would lead you to believe that the account was not his account?

A. No.

....

(Ex. C at 46:7-15.)

....

---

[19] Invariably, but hopefully not, Defendant both could have presented this witness in lieu of another—given their same race defense. Based upon this record, it simply appears that Elebesunu was not the intervenor.

Q. Ms. Fuentes, had you decided based upon your questioning Mr. Banks that you were going to make an exception for him?

A. Yes.

Q. Okay. And at that particular point, did you begin to process the transaction?

A. Yes.

Q. Did you complete processing the transaction?

A. No.

....

(*Id.* at 47:14-22 - 48:1).

....

Q. Okay. Now, relative to Valentina (Elebesunu), Valentina came and talked to him. Did she tell him that he needed the two forms of identification?

A. Yes. Yeah, she did.

Q. Okay. And did she tell you to reverse the transaction?

A. Yes, because she, she didn't make exceptions at that time.....

....

(*Id.* at 60:12-18.)

According to Fuentes, Elebesunu did in fact intervene and did in fact reverse the transaction. Additionally, the evidence shows that the teller did approve the transaction based two forms of identification. (*See* Ex. F, which documents both the Rhode Island Drivers License and the Metropolitan Police ID as being acknowledged by Defendant during the transaction.) Moreover, the bank manager's treatment and forced removal of Banks was extreme and unnecessary; at no time did he respect Bank's rights as a customer or give any credence to his situation. Rather, he treated him as if he was indeed a trespasser and a common criminal.

29

Based upon this record, this court cannot give validity to Defendant's exaggerated factual allegations and contemptuous factual inconsistencies. When viewed in a light most favorable to Plaintiff, this record refutes Defendant's factual and legal arguments for summary judgment. In opposing a motion for summary judgment, "it is sufficient to allege some factual dispute between parties." *Charles v. National Rehab. Hosp.*, No. 94-071 (RMU), 1994 WL 874211, at 4 (D.D.C. Sept. 29, 1994), aff'd; 72 3d. 9.9 (D.C. Cir 1995). The requirement is that there be no genuine issue of material fact. Here, there is more than a minor dispute of material fact. There are substantial factual discrepancies on major issues.

## CONCLUSION

Based on the genuine issues of material facts raised by Plaintiff's facts and arguments, Plaintiff has amply demonstrated a contentious factual and legal record that defeats any possibility of summary judgment.

WHEREFORE PREMISES CONSIDERED, Plaintiff respectfully requests that this Court enter an Order denying Defendant's Motion for Summary Judgment in its entirety, and request that he be granted all other relief to which he should be justly entitled.

Respectfully submitted,


_____/s/_____
Donald M. Temple [Bar #: 408749]
TEMPLE LAW OFFICES
1229 15th Street, N.W.
Washington, D.C. 20005
(202) 628-1101
(202) 628-1149 (fax)
ATTORNEY FOR PLAINTIFF