

# EXHIBIT B

**Capital Reporting Company**



Page 1

1    IN THE UNITED STATES DISTRICT COURT OF THE

2                DISTRICT OF COLUMBIA

3                CIVIL DIVISION         ORIGINAL

4    --------------------------------:

5    GEORGE BANKS                    :

6              Plaintiff,     : Case No.

7         v.                  : 05-CV01688

8    BANK OF AMERICA, ET AL.        :

9              Defendants.          :

10   --------------------------------:

11                        Washington, D.C.

12                   Monday, July 31, 2006

13   Deposition of:

14              GERMAN JORDAN,

15   called for oral examination by counsel for

16   Plaintiff, pursuant to notice, at the office of

17   Miles & Stockbridge, 1900 M Street, N.W.,

18   Washington, D.C., before Sheri C. Stewart,

19   Registered Professional Reporter and Notary

20   Public in and for the District of Columbia,

21   beginning at 10:15 a.m., when were present on

22   behalf of the respective parties:

Capital Reporting Company

Page 6

1      A      Double major, market and finance, BS

2   degree.

3      Q      From where?

4      A      Radford University.

5      Q      Where is that?

6      A      Radford, Virginia.

7      Q      How are you spelling that, please?

8      A      R-A-D-F-O-R-D.

9      Q      And year?

10      A      '85.

11      Q      And are you presently employed?

12      A      Yes.

13      Q      And which branch or where?

14      A      I'm at the Beacon Hill branch, that's

15   in Alexandria, Virginia.

16      Q      How long have you been there?

17      A      A little bit over a year.

18      Q      And where were you before that?

19      A      Before that I was at the Adams Morgan

20   branch.

21      Q      When did you start at Adams Morgan

22   branch?

Capital Reporting Company

```
1       A       I would say April 2002.

2       Q       And when did you actually leave there?

3       A       May 2005.

4       Q       How long have you been with Bank of

5   America?

6       A       Eight years and a half.

7       Q       What's your present title at Beacon

8   Hill?

9       A       I am the banking center manager.

10      Q       And your title at Adams Morgan?

11      A       Same.

12      Q       You have an accent.

13      A       Yes, I do.

14      Q       Okay.  What kind of accent?

15      A       Spanish.

16      Q       Where are you from originally?

17      A       From Bolivia.

18      Q       Okay.  How long have you been in the

19  United States?

20      A       On and off, it will be 25 years.

21      Q       Are you familiar with the policies and

22  procedures of the bank regarding customer service?
```

Capital Reporting Company

1       A       Yes.

2       Q       And are they codified or memorialized

3  in some type of publication?

4       A       Yes.

5       Q       And what kind of publications?

6       A       These are guides, you know, guidelines

7  that we have as far as customer service.  You

8  know, policies and procedures that we follow.

9       Q       And who's the custodian of the

10  particular document?

11      A       The bank.

12      Q       Would the bank branch also have a copy

13  of that?

14      A       Yes.

15      Q       Is that publication stated, the

16  customer service policies and procedures?

17      A       No, it would be -- would state policies

18  and procedures as far as, you know -- are you

19  talking about, you know, how to treat a customer

20  or --

21      Q       Yes.  Any --

22              MS. FREDERICK:  Like a manual.

Capital Reporting Company

1        A      On how to treat customers?

2    BY MR. TEMPLE:

3        Q      Yes.

4        A      No.

5        Q      Or is it a publication?  Is there a

6    document that governs customer relations?

7        A      No.

8        Q      Okay.  Customer service?

9        A      No.

10       Q      Okay.  What are you referring to when

11   you're talking about the policies and procedure?

12       A      Policies and procedures, meaning like,

13   for example, if a customer would come to the bank,

14   follow procedures that we follow as far as how to

15   handle the transaction.

16              But it wouldn't be, you know, like

17   there's a written manual, you know, smiling to the

18   customers.

19       Q      But you'd have procedures regarding how

20   to handle different types of checks?

21       A      Yes.

22       Q      Okay.  And what is that publication

Capital Reporting Company

1    called?

2        A       It's called the deposit disclosure.

3        Q       Deposit?

4        A       Disclosure.

5        Q       Disclosure.

6                And what is that document?

7        A       It's a form, document that's given to

8    every customer when they open up an account.

9        Q       And is there also a document that's

10   used for internal purposes with the bank teller

11   staff?

12       A       Yes.

13       Q       And what's that document called?

14       A       It's a training, teller operations

15   manual.

16       Q       And what is that document?

17       A       Where is the document?

18       Q       What is it?

19       A       What is it, it's a description of, you

20   know, all the policies and procedures for the

21   bank, how to handle transactions, how to, you

22   know, comply with the different regulations within

**Capital Reporting Company**

1      Q      Was Mr. Tubbs with you and him when you

2   walked over to the desk?

3      A      No, I was with Mr. Banks, Officer Tubbs

4   was still in the line.  The line was about maybe

5   seven feet away from where we were sitting.

6      Q      So Officer Tubbs remained in the line

7   while Banks walked over to your desk, is that

8   appropriate?

9      A      Yes.

10     Q      Did you sit down with Mr. Banks at that

11   time?

12     A      If I did, it must have been a second

13   because they kept on, you know.

14     Q      Did you ask him any questions when it

15   came to the desk?

16     A      I couldn't.

17     Q      Why?

18     A      Why, because, you know, he wasn't

19   talking to me, he was arguing with Officer Tubbs.

20     Q      At that point in time, even when he

21   walked to the desk?

22     A      That's right.

Capital Reporting Company

1       Q      And do you know what he said to Officer

2   Tubbs?

3       A      They were going back and forth.  To be

4   honest with you, I don't remember.

5       Q      Okay.  And did there come a time when

6   you were able to talk to the tellers to find out

7   what happened?

8       A      Yes.

9       Q      And when was that?

10      A      After Mr. Tubbs had left the bank

11  with -- excuse me, Mr. Banks had led Mr. Tubbs

12  [sic] out of the bank.

13      Q      Now, you at some point told the

14  security guard to take Banks out of the bank?

15      A      Yes.

16      Q      And the -- a security guard did in fact

17  begin that, initiate that process?

18      A      Right.

19      Q      Now, let me be clear.  When Banks came

20  over to talk to you, you could not have a

21  conversation with him?

22      A      No.

Capital Reporting Company

```
 1        Q      Okay.  Because he was angry?

 2        A      Yes.

 3        Q      And he was saying he was a victim of

 4   discrimination?

 5        A      No, at that point they were going

 6   backwards and forwards with Officer Tubbs.

 7        Q      Tubbs was still in the line?

 8        A      Yes.

 9        Q      And Tubbs was saying things to Banks,

10   and Banks saying things to Tubbs?

11        A      Yes.

12        Q      Is the security officer on the scene at

13   that particular point?

14        A      Yes, all the commotion, you know, of --

15   the officer obviously came, was close by.

16        Q      Where was he relative to where you were

17   with Banks?

18        A      Once we were at the desk, he was maybe,

19   you know, maybe where that chair is, four, four

20   feet away.

21        Q      Did Banks ever sit down when he was

22   over at the desk?
```

Capital Reporting Company

Page 31

```
 1        A      Sorry?

 2        Q      Did Banks ever sit down?

 3        A      Yes, sir.

 4        Q      Did you ever lead Banks to go to

 5   another location during that time that he was at

 6   that particular center?

 7        A      I couldn't talk to him.

 8        Q      Now, when you say you couldn't talk to

 9   him, tell me what you did to try to talk to him.

10        A      Well, first I tried to pull him out

11   from where he was, you know, to try to, you know,

12   to make sense of what was the problem.

13               Secondly, I said I was trying to talk

14   to him.  You know, obviously he wasn't interested

15   in talking to me, he was fighting with the

16   officer.

17        Q      Fighting?

18        A      Yes, meaning argue.

19        Q      Okay.

20        A      Police officer.  At that point when I

21   said, you know, this isn't working, I asked the

22   officer to escort him out, asked him to leave.
```

## Capital Reporting Company

Page 32

```
1        Q      What did the officer then do, the

2   security officer?

3        A      The security, Rice, and asked him to

4   leave.  And obviously Mr. Banks, you know, didn't

5   want to leave.

6        Q      And then what happened?

7        A      Then we asked him again, two or three

8   times to leave.  And, you know, he was sitting

9   there, he didn't want to leave.

10               Then the argument obviously, you know,

11   stopped with the officer and there was -- you

12   know, between the security guard and Mr. Banks.

13        Q      And then?

14        A      And then, you know, I remember Mr. Rice

15   telling him, you know, let's go (indicating).

16        Q      Basically you're demonstrating with

17   your hand, you're putting your hand on your

18   attorney's --

19               MS. FREDERICK:  Arm.

20   BY MR. TEMPLE:

21        Q      Arm, upper arm?

22        A      Right.
```

Capital Reporting Company

Page 33

1      Q      Okay.  And how did he put his hand on

2   Mr. Banks' arm?

3      A      This way (indicating) and asked him to

4   leave.

5      Q      Then what happened?

6      A      Then was when Officer Tubbs said that's

7   it -- you know, I told you to leave, you're

8   leaving.  You know, that was when Officer Tubbs

9   picked him up and, you know --

10     Q      Did Mr. Banks move at any point in time

11  the security guard put his hands on Mr. Banks'

12  arm?

13     A      Would you repeat that?

14     Q      Did Mr. Banks move in his location from

15  where he was at the point the security guard put

16  his hand on his arm?

17     A      No.

18     Q      How soon after the security guard put

19  his hand on his arm did the police officer come?

20     A      Maybe 20 seconds, ten seconds, 20

21  seconds.

22     Q      Did the security guard -- did the

Capital Reporting Company

Page 34

1   security guard and the police officer say

2   anything?

3       A     Yes, "They asked you to leave, please

4   leave."

5       Q     Okay.  So the security guard remained

6   involved with Mr. Banks when the officer was

7   taking him out of the bank?

8       A     Yes.

9       Q     What was the security guard doing?

10      A     He was just -- you know, he opened the

11  door for the police officer to take him out the

12  bank.

13      Q     Was only one person holding Banks or

14  was there two?

15      A     One.

16      Q     And that would have been the officer.

17            And the security guard didn't do

18  anything after that relative to Banks?

19      A     (Witness shakes head.)

20            MS. FREDERICK:  You have to say "yes"

21      or "no."

22      A     No, sorry.

Capital Reporting Company

1    BY MR. TEMPLE:

2        Q      And did you see Banks outside?

3        A      I saw him, yes.

4        Q      Okay.

5        A      As we were walking out, I told Officer

6    Tubbs, keep on, you know, this, you know, let him

7    go.

8               And that's when Officer Tubbs told me,

9    no, this is not a bank matter anymore, it's a

10   police matter.

11       Q      Why did you tell the security guard to

12   put Banks out of the bank?

13       A      Because I knew that I wasn't going to

14   get nowhere.  He wasn't interested in talking to

15   me or trying to solve the problem.  He was just

16   fighting and arguing and being disruptive.

17       Q      When you were talking to Banks at the

18   desk, Banks never talked to you, he only talked to

19   the police officer?

20       A      He kept turning around and going back

21   and forward.

22       Q      Did he ever have a conversation with

Capital Reporting Company

Page 36

1    you?

2          A      No.

3          Q      Did you ask him any questions?

4          A      No.

5          Q      What did you say to him when he came?

6          A      I told him, sir -- I don't know his

7    last name -- sir, would you please follow me, let

8    me help you, you know, and try to get him out of

9    this, because the confrontation between both of

10   them was -- I mean, it was really heated and

11   getting heated and louder.

12               So the whole idea was to get him out of

13   that area so we could, you know, find out what was

14   wrong and help him out.

15         Q      Did you see Banks outside of the bank?

16         A      Officer Tubbs was holding him, yes.

17         Q      Was he handcuffed at that time?

18         A      Yes.

19         Q      You said you talked to tellers after he

20   came back into the bank?

21         A      Right.

22         Q      Who did you speak to?

Capital Reporting Company

Page 37

1      A      I talked to Valentina as well as to

2   Roxanna.

3      Q      What did Valentina tell you?

4      A      You know, I was saying what happened,

5   you know, and obviously they told me that

6   Mr. Banks came, over the counter ticket, you know,

7   and when he was asked for a second ID, that's when

8   he blew up.

9      Q      That's what she told you?

10     A      Yes.

11     Q      Anything else?

12     A      Pretty much that was it.

13     Q      And did you meet with both of them

14  together?

15     A      No.   At first it was one on one, and

16  then at the end of the day, yes.

17     Q      Did you get a statement from Valentina?

18     A      Yes.

19     Q      And what kind of statement did you get?

20     A      The statement I got from her was that

21  Mr. Banks -- well, when she heard him with

22  Roxanna -- Mr. Banks was dealing with Roxanna, you

**Capital Reporting Company**

1    know.  Because he refused to leave the transaction

2    because, you know, there was only one ID.

3              And that he had -- you know, she had

4    requested a second ID, and Mr. Banks was yelling

5    at her.

6              With that commotion, Valentina went to

7    see what's going on with -- with Roxanna.

8        Q     Valentina did a written statement to

9    you?

10       A     She wrote, yes.

11       Q     Okay.  Was that on the incident report

12    form?

13       A     Yes.

14       Q     Who would have custody of that

15    particular document?

16       A     The bank.

17       Q     Did Roxanna do a written incident

18    report statement?

19       A     I believe so.

20       Q     And that was per your request?

21       A     Yes.

22       Q     Okay.  And what did she state in the

## Capital Reporting Company

1    report?

2        A    What I remember was that, you know,

3    that we got -- Mr. Banks came to her window, he

4    handed her an over-the-counter ticket.  When she

5    requested a second ID, the customer got upset.

6        Q    And then what happened?

7        A    And that was it.

8        Q    Based upon your understanding of the

9    incident, did Banks ever produce a second

10   identification?

11       A    No.

12       Q    Was the transaction ever processed?

13       A    No.

14       Q    Was the transaction reversed?

15       A    Yes, I found that out later.

16       Q    When did you find that out?

17       A    It processed -- it was reversed because

18   there was not a second ID.

19       Q    So explain to me, please, what a bank

20   teller does when an over-the-counter transaction

21   is requested.

22            Out comes the bank teller, says I want

**Capital Reporting Company**

1    to get X amount of money out of the bank.  What

2    does the bank teller do?

3         A    First, because he's a corporate

4    account, you've -- the teller would pull out a

5    signature card, my signature with signature on

6    there.

7              Secondly, the system's come to require

8    for them to key the ID in the system before they

9    can cash the checks.  Why, because he had an

10   over-the-counter ticket.

11             And there was not a second ID, you

12   know, bank procedures, you know, cannot cash the

13   check.

14        Q    Explain to me how a transaction gets

15   processed before a second ID is provided.

16             MS. FREDERICK:  What kind of

17        transaction?  I don't understand.

18   BY MR. TEMPLE:

19        Q    In this particular situation.

20        A    May be that the teller processed it and

21   was asking for the second ID.  When the second ID

22   wasn't presented, she reversed it.

Capital Reporting Company

Page 41

1    Q    Did you ever -- when you talked to

2  Roxanna, did she ever tell you that she had

3  actually approved the transaction?

4    A    No.

5    Q    And to your knowledge, as of today, you

6  don't know that she did, it's your view that she

7  did not approve the transaction?

8         MS. FREDERICK:  Objection.

9  BY MR. TEMPLE:

10   Q    Would that be accurate?

11   A    Yes.

12   Q    And do you know why she said Mr. Banks

13 was arguing with her?

14   A    Because she requested a second ID.

15   Q    And tell me, please, what kind of

16 discretion does she have to process a transaction,

17 commercial, corporate, when the patron has only

18 one ID and the requested transaction is a thousand

19 dollars or less?

20   A    With the system that we had back then,

21 they had to have two IDs.

22   Q    Absolute, unequivocal requirement?

Capital Reporting Company

1        A        If you don't know the person, yes.

2        Q        And so the answer to my question is

3    that she had no discretion?

4        A        Correct, for that amount of money,

5    correct.

6        Q        Then would the head teller have any

7    discretion for that amount of money if the patron

8    only had one ID?

9        A        Discretion, yes.

10       Q        To what extent?

11       A        I -- the discretion would be based on

12   the customer.

13                If there's a person who shows up the

14   first time and I don't know the person, you know,

15   it goes into effect.

16                The tellers are given -- tellers are

17   given full, can I say, you know, freedom to act.

18   If they don't feel comfortable with the

19   transaction, they will not do it.

20       Q        You said teller, you meant head teller?

21       A        Yes.

22       Q        The teller doesn't have the freedom to

Page 43

1    act?

2        A       Correct.

3        Q       Now, hypothetically if a person is

4    coming to the bank and that person wants to take a

5    thousand dollars out of her savings account,

6    commercial account, and put the thousand dollars

7    into the banking account, but wants to take $300

8    out of the -- a thousand out of savings into

9    checking, and that person wants to take 300 out of

10   that checking account after depositing a thousand

11   dollars, what part of that -- what number then

12   would be considered the withdrawal?

13       A       A thousand.

14       Q       Why?

15       A       Why, because you have to process one in

16   order to process the other one.  So I have to get

17   the thousand dollars out first in order to

18   transfer whatever amount of money for that

19   account.

20               So it wouldn't be like giving him the

21   money altogether and say a thousand minus 700

22   equals 300, no, it would be thousand coming out,

Page 44

1    and then 700 going in.

2        Q      Is there any documents anywhere which

3    would explain that?

4        A      Yes.

5        Q      Where would that be?

6        A      It would be the way the system works, I

7    cannot transfer money from one account straight

8    from one to the other, I have to process one

9    transaction first and then the second.

10       Q      Is it a document that would define what

11   would constitute a withdrawal under that

12   situation?

13       A      Yes.

14       Q      And what document would that be?

15       A      It would be testing where the system

16   operated.

17       Q      Still, is there a document that

18   describes that?

19       A      No, no, it is the way that the thing

20   works.

21       Q      Who's the highest ranking person in the

22   region charged with customer relations?

## Capital Reporting Company

1      A      In the region would be the regional

2    executive.  At that time, would be Mr. Christian.

3      Q      How about the national level?

4      A      National level would be probably Ken

5    Lewis, the CEO.

6      Q      There's no vice president that would

7    have that particular responsibility?

8      A      Well, the higher would be the CEO.

9      Q      How about after the CEO?

10     A      I'm sure they have layers of people

11   underneath that but --

12     Q      You don't know who that would be?

13     A      No.  But I know that Bank of America

14   treats that seriously, to the point where I've

15   seen people complaining to the CEO and the CEO

16   would find out what's going on.

17     Q      Why didn't this incident trigger an

18   investigation at the regional level, at the higher

19   regional level outside of the branch, the bank

20   branch?

21     A      Because of -- sorry.

22            MS. FREDERICK:  So you said why didn't

## Capital Reporting Company

Page 46

1       it?

2               MR. TEMPLE:  Yes.

3       A       Why didn't?

4    BY MR. TEMPLE:

5       Q       Yes.

6       A       It did.

7       Q       It did.

8               What did that investigation consist of?

9       A       Consisted of pulling the videos out,

10   you know, pulling records of the, you know, what

11   we said on the security logs.

12      Q       What would that consist of when you say

13   the records, the security logs?

14      A       Well, you know, what I wrote, my

15   statement, officer's statement, you know --

16      Q       And the video?

17      A       Right.

18      Q       What would that -- did you see the

19   video?

20      A       Yeah.

21      Q       When did you see it?

22      A       Must have been a few weeks after the

Capital Reporting Company

Page 47

1    incident.

2        Q      Where did you see it?

3        A      The branch.  That was sent to corporate

4    security.

5        Q      Who?  You said what?

6        A      The video was sent out to corporate

7    security.

8        Q      Who in corporate security?

9        A      I don't know.  I mean, I don't recall.

10       Q      Where is corporate security located?

11       A      Used to be in the Greenbelt office in

12   Maryland.  Bonnie Sobolewski.

13       Q      Bonnie is the first name?

14       A      Yes.

15       Q      Male or female?

16       A      Female.

17       Q      Did you watch the video with Bonnie

18   Sobolewski?

19       A      I didn't watch the video.  I saw parts

20   of the, you know, the video.

21       Q      Tell me what you saw.

22       A      I saw the commotion going on, you can

## Capital Reporting Company

Page 48

1    see the picture, I don't see any -- any -- you

2    know, how can I say, what I see is people looking,

3    I see picture of myself, I see picture of

4    Mr. Banks.

5        Q    When you saw the pictures of Mr. Banks,

6    what was he doing?

7        A    He was talking to the teller, and I

8    think I was talking to him also.

9        Q    Was his voice raised on the video?

10       A    There's no audio.

11       Q    Okay.  Was he animated in any way,

12   moving his hands, arms?

13       A    I don't recall.

14            MR. TEMPLE:  Could we just take a

15       two-minute break, please?

16            MS. FREDERICK:  Sure.

17            (Whereupon, there was a break from

18   10:55 a.m. until 10:58 a.m.)

19   BY MR. TEMPLE:

20       Q    How did they get a copy of the video?

21            MS. FREDERICK:  Who's "they"?

22   BY MR. TEMPLE:

Capital Reporting Company

Page 49

1      Q      National security guard, corporate

2    security?

3      A      They requested the video.

4      Q      Did you give them the video?

5      A      Yes.

6      Q      What format was it in?

7      A      Just it was the, you know, the regular

8    videos, the old ones, we don't use those anymore,

9    that's why.

10     Q      VHS?

11     A      VHS, there you go.

12     Q      Did you give a copy as well to the

13   District of Columbia?

14     A      That, I don't know.  If it was

15   requested, then it would have come.  Not from the

16   branch but from corporate security, I don't know.

17     Q      And do you know how you spell Bonnie's

18   last name?

19     A      Right now, no.

20            MS. FREDERICK:  I have it.  I have her

21        last name.

22   BY MR. TEMPLE:

Capital Reporting Company

1      Q     Did the video show Mr. Banks walking

2   with you to the chair?

3      A     I remember seeing, you know, like

4   pictures of me and him talking, him talking with

5   the teller, you know.  I don't remember.

6      Q     When he was talking to the teller, was

7   he -- was he always yelling?

8            MS. FREDERICK:  Objection.  He said

9        there was no audio.

10  BY MR. TEMPLE:

11     Q     I'm not talking about what the video

12  showed, I'm talking about when he was talking to

13  the teller, your observations of him talking to

14  the teller.

15           Was Mr. Banks yelling the whole time?

16     A     I don't recall that.

17     Q     Under the circumstances, there was no

18  time during that time that Banks was in the bank

19  that you could have intelligent conversation with

20  him?

21     A     No.

22     Q     What is your bank's policy

Capital Reporting Company

Page 51

1    regarding staff discipline?

2        A    If there is -- you mean as far as

3    customer service?

4        Q    Overall.

5        A    Overall, the strict discipline as far

6    as being, you know, there is disciplinary action

7    taken as far as customer service.  There are

8    disciplinary actions taken as far as not meeting

9    their daily goals.

10       Q    Who makes -- who disciplines?

11       A    The teller coordinator, speaking of

12   tellers, the teller coordinator, also the banking

13   assistant manager as well as the manager.

14       Q    If the teller or head teller is -- or

15   teller coordinator is involved in an action that

16   potentially commanded discipline, who would

17   discipline the teller coordinator and teller?

18       A    The assistant manager or the bank

19   manager.  You know, I was talking to you about the

20   360 degree, excuse me, core values.

21       Q    Yes.

22       A    One of those, the 360 degree coaching.

Capital Reporting Company

Page 52

1    So a lot of complaints that we hear, you know,

2    probably would be coming also from the tellers

3    about the D.C.

4        Q    About?

5        A    D.C. or there's a discrepancy with

6    D.C., let's say.  The tellers would be complaining

7    also, and somebody we would be hearing from the

8    tellers.

9        Q    Who would discipline the bank manager?

10       A    Regional manager.

11       Q    And you said there was an investigation

12   here.  Do you know what the investigation

13   consisted of?

14       A    Finding out the facts, what happened.

15       Q    Are you aware as to how that

16   investigation took place?

17       A    Yes.  I was called, I was asked what

18   happened.  Valentina was called, you know, I'm

19   sure that the teller was also called, asked what

20   happened.

21       Q    Anybody else?  Was there an

22   investigative report prepared?

Capital Reporting Company

Page 53

1       A       I don't know.

2       Q       Is there usually and customarily a

3    investigation report required?

4       A       I would think so.

5       Q       Do you know if one was prepared?

6       A       I don't know.

7       Q       Were you asked to give a written

8    statement?

9       A       Over the phone, yes.

10      Q       Do you know if your statement was put

11   into writing?

12      A       I don't know.

13      Q       And was an interview conducted over the

14   phone with Valentina and --

15      A       Not with Valentina. I mean, the

16   corporate security, I would answer yes.

17      Q       And so the extent that you know about

18   the investigations, one of the investigations was

19   conducted. The video was watched?

20      A       Yep.

21      Q       And that you gave a statement. The

22   head teller gave a statement?

Capital Reporting Company

Page 54

```
1      A    Yes.

2      Q    Do you know whether anyone else was

3  interviewed?

4      A    Probably the guard.

5      Q    Um-hum.

6      A    I don't think he would have been

7  interviewed, but I'm sure that he's -- notes would

8  have been taken.

9      Q    Um-hum.  And how about Mr. Banks?

10     A    I'm sorry?

11     Q    How about Mr. Banks?

12     A    I don't know.

13     Q    You have a guard given a written

14  statement?

15     A    They write their logs on a daily basis.

16     Q    When did this investigation take place?

17     A    Few weeks after the incident.

18     Q    Do you know what the findings of the

19  investigation was?

20     A    No.

21     Q    And nobody was disciplined as a result

22  of that particular incident; is that right?
```

Page 55

1      A      No.

2      Q      Under what circumstances could a bank

3  teller refuse to service a patron, a bank patron?

4      A      Under the circumstances where the

5  customer is not providing -- an example would be

6  IDs.

7      Q      And when would a bank teller call

8  security?

9      A      It wouldn't be the teller calling

10  security.  It would have been, you know, once it's

11  escalated to the place where, you know, there's no

12  way to fix the problem.

13      Q      At what point would a bank manager call

14  security?

15      A      When I see that I'm ignored, you know,

16  things are not, you know, it's just not happening.

17  When the customer gets to be unreasonable where I

18  cannot -- cannot deal with the person anymore.

19      Q      What would be your policy for ordering

20  a customer to get out of your bank?

21      A      Only when the customer gets abusive.

22  When the customer gets abusive with people where,

Capital Reporting Company

1    you know, the customer is not reasonable anymore.

2        Q    Was Mr. Banks abusive here?

3        A    I think so.

4        Q    To whom?

5        A    To the tellers.

6        Q    What about his conduct was abusive?

7        A    Screaming, yelling.

8        Q    If a customer has a legitimate

9    complaint and upset about the manner in which she

10   or he is treated, and there is screaming and

11   yelling about a complaint, but it's legitimate,

12   would you have a view then that customer should be

13   handled differently?

14       A    Yes.

15       Q    Why?

16       A    Why, because I'm hearing what the guy

17   has to say.  If it's legitimate, I'm not going to,

18   you know, or I don't think anyone is going to put

19   themselves in a situation where, you know, you're

20   wrong, but you're defending something that's

21   wrong, we're there to help our customers.

22       Q    So if his or her complaint was

Capital Reporting Company

Page 57

1    legitimate and that perhaps the bank teller was

2    rude or perhaps misunderstood the practice or

3    policy, then you would -- how would you deal with

4    the bank teller in that situation?

5        A    Before I -- hopefully I get into the

6    picture, the D.C. teller coordinators should have

7    corrected them.

8        Q    Say that again.

9        A    Before that, that I would get into the

10   picture, probably the teller coordinator should

11   have been -- corrected that problem.

12            Whether it be coaching the teller on

13   the spot, you know, right procedures for the

14   teller to handle.

15            That's a question, probably would be to

16   the assistant manager.  The assistant manager

17   would be coaching probably both of them before the

18   manager's called.

19       Q    Under your policies and procedures, can

20   a security officer employed by the bank or

21   contracted with the bank physically touch a

22   patron?

Capital Reporting Company

Page 58

1      A     Physically, meaning assaulting, assault

2    customer, beat him up or just touch?

3      Q     Putting a finger on a person,

4    physically touch.

5      A     I don't know.

6      Q     You don't know?

7      A     I don't know.

8      Q     Who would know?

9      A     Corporate security.

10     Q     Who at corporate security?

11     A     Same person, Bonnie Sobolewski.

12     Q     Have you prior to this particular

13   incident asked security to remove someone from the

14   bank?

15     A     No.

16     Q     This is your first time?

17     A     Yes.

18     Q     Have you had irate customers before

19   this?

20     A     Many times.

21     Q     Why didn't you ask irate customers to

22   be removed from the bank before this?

Capital Reporting Company

1    A    Because once we brought them into the

2  office or pulled them aside, they would calm down

3  and talk and explain what was the problem.

4  Sometimes, you know, I could help them, sometimes

5  I couldn't.

6    Q    So irate customers in the past would be

7  different from Banks because they would have

8  calmed down and you would have been able to help

9  them and solve their problem?

10   A    Correct.

11   Q    But Banks didn't calm down?

12   A    No.

13   Q    So would you say, then, that Banks'

14 demeanor was emotionally the same at the time he

15 was at the teller window to the time he went to

16 the chair to sit down?

17   A    Actually, I believe it got worse as he

18 got to the chair, because the argument got more

19 heated and got more personal between him and the

20 officer.

21   Q    So it was worse, it was heightened --

22   A    Yes.

Capital Reporting Company

Page 60

1      Q      -- when he was at the chair?

2      A      Yes.

3      Q      Was he using any profanity?

4      A      I don't recall that.  I don't know.

5      Q      You looked at the transaction on paper

6  since?

7      A      Once I was shown the previous

8  deposition that showed me the ticket.

9             (Whereupon, Jordan Exhibit No. 1 was

10  marked for identification.)

11            MS. FREDERICK:  Is that exhibit going

12       to be two pages?

13            MR. TEMPLE:  Yes.

14  BY MR. TEMPLE:

15      Q      You recognize this document?

16      A      Yes, sir.

17      Q      And is this your particular statement?

18      A      Yes.

19      Q      When did you prepare this statement?

20      A      The same date as the incident happened.

21      Q      Is this an incident report?

22      A      Yes.

Capital Reporting Company

Page 61

```
 1        Q     Okay.  Is this the type of document
 2   that the head teller and the teller would have
 3   completed as well?
 4        A     Yes.
 5        Q     And up at the top it says case number;
 6   there's no case number in this particular case?
 7        A     No.
 8        Q     Corporate security for some reason,
 9   that's just standard?
10        A     Right, standard.
11        Q     Direct your attention to the incident
12   type.
13        A     Incident type?
14        Q     Yes, section one, it says assault,
15   criminal trespass and threat.
16              What was the assault that was at issue
17   here?
18        A     The way that I understand the assault
19   would be somebody's verbally, you know, assaulting
20   him, it's verbally being abusive.
21        Q     What's your understanding based on?
22        A     Based on the way that he was talking.
```

Capital Reporting Company

```
 1      Q      Who was he verbally abusive to?

 2      A      To the teller.

 3      Q      And so the assault that's referenced

 4   here was to the tellers.

 5             Did he ever threaten the tellers, do

 6   you know?

 7      A      The way that he was conducting himself,

 8   yes, after he was a threat, threat to anyone.

 9      Q      And it says criminal trespass.  What's

10   criminal trespass?

11      A      I guess if he was asked to leave and he

12   refuses to leave.

13      Q      So you're referring to what -- you told

14   him to leave.  And he didn't leave?

15      A      Right.

16      Q      Was he harassing?

17      A      Yes, he was harassing everybody.

18      Q      Why do you think that?

19      A      Why?  Because of his behavior.

20      Q      If he has --

21      A      He was harassing the tellers because

22   they would not comply with what he said.
```

Capital Reporting Company

Page 63

1      Q     If he has an account at your bank,

2   multiple accounts, and he's inquiring about his

3   accounts, how is that deemed harassment?

4      A     Well, at this point he wasn't inquiring

5   about the accounts anymore.

6      Q     At this particular point he was

7   protesting?

8      A     He was more than protesting, he was

9   verbally being abusive to the teller.

10     Q     What did he say that was considered

11  verbally abusive?

12     A     Well, the way that he was demanding,

13  you know, for, you know, his request to be

14  processed.

15           You know, that even though the teller

16  was telling him, you know, he needs a second ID.

17     Q     So it's your contention that he never

18  produced a requested second identification?

19     A     Yes, sir.

20     Q     And you say here, threat as well?

21     A     Yes.

22     Q     Why threat?

Capital Reporting Company

1      A      Why?  Because of the -- how much he was

2    yelling and screaming, I think, I felt threatened.

3      Q      You felt threatened in what respect?

4      A      I didn't know what he was about to do.

5    I never met Mr. Banks before.  I didn't know

6    whether he was going to scream at me or kill me or

7    somebody else, I don't know.

8      Q      Did he do anything that suggested a

9    threat of violence to you or anyone else there?

10     A      Basically, no; but verbally, yes, the

11   way he was conducting himself.

12     Q      Have you not had customers come in and

13   yell before?

14     A      Yes.

15     Q      What's different about what Banks was

16   saying when he was yelling and your other

17   customers who had been yelling?

18     A      The big difference would be that once

19   we talked to the customers, you know, most of them

20   would calm down and try to explain, make a point

21   as to why, you know, we should do whatever they

22   want us to do, you know.

Capital Reporting Company

Page 65

1          Well, in this case, Mr. Banks kept on

2    yelling and screaming and got louder and louder.

3        Q    You don't remember anything that

4    Mr. Banks said?

5        A    Well, you know, not specifically, no.

6        Q    You said that most of your other

7    customers would make a point of validity about

8    their transaction?

9        A    Right.

10       Q    And you're saying that Mr. Banks was

11   not making a point because?

12       A    No.  Why?  Because he kept on arguing

13   with Officer Tubbs.  And backward and forward.

14       Q    But he never talked to you at all?

15       A    Very -- I mean, we crossed, you know,

16   ten words each other.

17       Q    And that's prior to you telling him,

18   the guard, get him out of here.

19       A    Yes.

20       Q    What of your policies and procedures

21   say about that particular act, you telling him to

22   get out of here?

Capital Reporting Company

1      A     I mean, if you ask and the person

2   doesn't leave, I would call the police.

3      Q     Say that again.

4      A     Call the police.

5      Q     Why didn't you call the police?

6      A     In this case because the police was

7   there already.

8      Q     How do you know there was a policeman?

9      A     He showed us his badge.  When I

10  approached Mr. Banks at the very beginning, you

11  know, he told us, I'm a police officer, here's my

12  badge.

13     Q     Who told you that?

14     A     Officer Tubbs.  "The manager told you

15  to calm down, calm down."

16     Q     Had you ever seen him there before?

17     A     Officer Tubbs?

18     Q     Tubbs.

19     A     No.

20     Q     Was Tubbs carrying himself in a

21  professional manner?

22     A     Yes, sir.

## Capital Reporting Company

Page 67

```
 1        Q       Was he screaming at Mr. Banks?

 2        A       He was arguing, whatever Mr. Tubbs was

 3   saying.

 4        Q       Was he screaming at Mr. Tubbs?

 5        A       He was loud, yes.

 6        Q       Did Tubbs know -- were you able to

 7   determine if Tubbs knew why Mr. Banks was upset?

 8        A       No.

 9        Q       Did you have a conversation with

10   Mr. Tubbs at any point in time?

11        A       No.

12        Q       Section two says incident narrative.

13   Can you read that into the record, please?

14        A       "Customer started to yell and be

15   abusive to the teller.  When she was trying to

16   take care of the transaction, they approached

17   customer to find out what was going on.  Customer

18   kept on, I guess screaming and yelling, for no

19   apparent reason.  At that time an officer in

20   civilian clothes approached us to see what was

21   happening, I asked customer to" --

22                MS. FREDERICK:  "Calm down."
```

Capital Reporting Company

Page 68

1      A     -- "to calm down and told that I

2    would" -- I cannot make out, I'm sorry.  I don't

3    know.  "Customer" --

4           MS. FREDERICK:  "Got louder and

5           louder."  That's a bad copy.

6      A     "Customer got louder and louder, and my

7    security and police officer asked him to calm down

8    several times, took him outside, he was arrested."

9    BY MR. TEMPLE:

10     Q     What time did you prepare this

11   particular form?

12     A     Right after we closed the bank.

13     Q     What time did you close the bank that

14   day?

15     A     We close at 12, so it must have been

16   about 12:15 or 12:30.

17     Q     To the left it says that a police

18   report was filed and an arrest was made, yes?

19     A     Yes.

20     Q     Okay.  What's the next page?

21     A     Next page --

22           MS. FREDERICK:  This is a separate

Capital Reporting Company

Page 69

1          document.

2     BY MR. TEMPLE:

3          Q     Did ya'll prepare these documents

4     together?

5          A     No.

6          Q     Did anybody consult with either one of

7     you to prepare the documents?

8          A     No.

9          Q     Had you seen this document before

10    today?

11               MS. FREDERICK:  "This," meaning which

12         one?

13         A     Well, I saw it when we faxed this

14    copies to, you know, to security.

15    BY MR. TEMPLE:

16         Q     Excuse me.

17               (Whereupon, there were discussions off

18    the record.)

19    BY MR. TEMPLE:

20         Q     Do you know why on the document the

21    times are exactly the same, the way the Saturday

22    is printed there?

Capital Reporting Company

Page 70

1      A      I don't know.

2      Q      You don't know, okay.

3      A      You mean the time, 11:10?

4      Q      Yes.  Do you know why his incident

5   type -- did anybody from the bank help him to

6   prepare this document?

7      A      No.

8      Q      You had no discussion about these

9   incident types?

10     A      Well, we -- we talked, but it wouldn't

11  be like we sat together and wrote it together.

12             It was at the end of the day, obviously

13  we wanted to find out what happened.  Because even

14  though, you know, I mean, in the eight years that

15  I work at the bank, the only time that I had

16  somebody arrested at the bank.

17             So, yeah, we talked about it, you know,

18  obviously everybody from their perspectives.

19             (Whereupon, Jordan Exhibit No. 2 was

20  marked for identification.)

21  BY MR. TEMPLE:

22     Q      I hand you Exhibit 2, please.  Could

Capital Reporting Company

Page 71

1   you tell me what that document is?

2        A    I'm sorry?

3        Q    Could you tell me what that document

4   is?

5        A    Yes.  It's an over-the-counter debit

6   slip.

7        Q    And the debit slip --

8        A    A withdrawal slip.

9        Q    And is the information that's made on

10  that debit sheet correct, to your knowledge?

11       A    Correct.

12       Q    And there's an account number.  What

13  does that account number state there?

14       A    You mean the number?

15       Q    What does it mean, yes.

16       A    What it means, this, in the upper right

17  side of the ticket says D.C., so we know it's the

18  D.C. account, and the numbers that start with 0019

19  would be the account of Mr. Banks.

20       Q    And it says total withdrawal, a

21  thousand dollars?

22       A    Right.

Capital Reporting Company

Page 72

1      Q      What does that mean?

2      A      It means the customer's requesting to

3   withdraw a thousand dollars out of his account.

4      Q      Below that is a signature statement

5   there, and it looks like some information.  What

6   is that information?

7      A      It would be the name of the company in

8   this case, the address of the company, the

9   telephone number of the company.

10            I see the customer signature here, and

11   the amount of money written as well as numbers in

12   the bottom.

13      Q      Further below that, it says --

14      A      A stamp.

15      Q      There is a stamp.  Tell me about that

16   stamp.

17      A      That stamp is used whenever somebody's

18   going to make a transaction, includes the ID.

19      Q      Here it says ISS by RI.  What does that

20   mean.

21      A      Issued by Rhode Island.

22      Q      Type, D2?

Capital Reporting Company

Page 73

1      A     Type, D2, it would be type of ID, issue

2    date, there's no issue date.  And discretion date

3    would be 9/24/05.

4      Q     And this says ID number?

5      A     ID number would be the Rhode Island ID

6    number and No. 901076.

7      Q     And the second ID type?

8      A     Over here it says Metropolitan

9    Police-something ID.

10     Q     When is the first time you saw this

11   document?

12     A     At the deposition two years ago.

13     Q     Okay.  And did you ever have a

14   conversation with your teller regarding whether

15   she indicated a second ID type for this particular

16   document?

17     A     Yes.

18     Q     When did you have that conversation?

19     A     At the day of the incident, you know,

20   in which the teller, the teller coordinator told

21   me that it was only one ID presented.

22           (Whereupon, Jordan Exhibit No. 3 was

Capital Reporting Company

Page 74

```
1    marked for identification.)

2    BY MR. TEMPLE:

3        Q    I'm showing you Exhibit 3.  Exhibit

4    stamp on the back.

5             Could you walk me through that detail,

6    please.

7        A    Sure.  It tells you the bank, 3018001,

8    means Adams Morgan.  Prior to that you see the

9    NDC, lets me know it's a D.C. bank.

10            The 004, that would be the teller

11   number.  Right beside that would indicate Roxanna,

12   the date.  06/17/02 would be date that -- of the

13   transaction.

14            Even though the transaction was

15   conducted on a Saturday, the banks work from

16   business day to business day.  Therefore, the

17   Saturday transaction goes as a Monday transaction.

18            Then you got the account number,

19   001920972903, there's no check, check No. 0 it

20   says according to here, and the actual date of the

21   transaction, that's 6/15/02 of 10:55 a.m.,

22   thousand dollars.
```

Capital Reporting Company

1     Q     Now, what does that mean, that bottom

2  line, what does that mean?

3     A     Means that -- the bottom line would be

4  the transaction occurred.  Even though the bank's

5  working on the 17th, on Monday's date, a Saturday

6  date that this happened, it's showing the

7  transaction that occurred on that given date at a

8  given time.

9     Q     What does the 6/15/02, 10:55 a.m., a

10  thousand dollars indicate, what does that mean?

11     A     6/15/02 would be the customer -- the

12  date when the transaction was done and the time,

13  10:55.

14     Q     And so the thousand dollars at that

15  point would have been moved from one account to

16  another?

17     A     No.  Well, at this point, it should

18  have been processed but, yeah.

19     Q     Okay.  And it says cash, check,

20  savings, then it says hold.  What does the hold

21  mean?

22     A     Hold would be whenever you place -- you

### Capital Reporting Company

Page 76

1  make a deposit, you know, it means it is putting

2  it on a hold.

3          If it is a Bank of America check, it's

4  easy for us to go into the account and make funds

5  available right on the spot. But if there's no

6  check from the bank, then obviously there's a hold

7  placed on that.

8      Q    But in this particular case, was there

9  a check provided?

10     A    Based on what I know of the case, no.

11     Q    Could you tell whether there was a

12 check?

13     A    No.

14     Q    Okay. What was -- actually happened,

15 can you break it down for me?

16     A    Yes, it was that customer requested for

17 a thousand dollars, he wanted to transfer $700

18 into his personal account, and that was why he was

19 requested for the two IDs.

20          MS. FREDERICK: What are you looking

21     for?

22 BY MR. TEMPLE:

Capital Reporting Company

1    Q    Let me show you this deposit ticket for

2  $700.  Can you tell me what that is, please?

3    A    Yes.  This is a deposit slip for

4  another account, same company, a different

5  account.

6    Q    Is that deposit ticket -- what does it

7  mean to you?

8    A    What it means is that the person, in

9  this case Mr. Banks, was trying to deposit $700 in

10  cash into this account.

11    Q    $700 in cash?

12    A    Correct.

13    Q    Into that account.

14         Now, what's your understanding of the

15  transaction and having the benefit of this

16  particular exhibit?

17    A    This one here, okay.

18    Q    Which is Exhibit 2.

19    A    This is -- the person is withdrawing

20  money from one account and transferring to another

21  account.

22    Q    But he doesn't have an actual check?

Capital Reporting Company

Page 78

1       A     Right.

2       Q     That is a deposit?

3       A     Yes.

4       Q     Okay.  And the -- all of the money

5   that's at issue is already in the bank?

6       A     In the bank.

7       Q     Okay.  Under that particular situation,

8   he would still be required to present two

9   identifications?

10      A     That's correct.  If I can explain that.

11            The main reason is this.  Number one,

12  is that he's using an over-the-counter withdrawal

13  slip.

14            Secondly, even if you see the IDs over

15  here, a Rhode Island ID to me would have been a

16  second flag.

17      Q     Would have been what?

18      A     A second flag.  I wanted to make sure

19  that we're not doing anything.  Because I need to

20  process one in order to transfer the money to the

21  other.

22      Q     What would you have to have done first?

Page 79

1       A       Withdraw the money out first.

2       Q       How much?

3       A       Thousand dollars.  And then deposit it

4    into the account so there are two separate

5    transactions.

6       Q       And the withdrawal of the thousand

7    dollars out would have required two

8    identifications?

9       A       Yes.

10       Q       And, again, as to the exhibit here,

11    that particular encryption comes from the machine

12    that is used by the teller?

13       A       Right.

14       Q       At what point does the teller actually

15    put that encryption on the document?

16       A       As the transaction is being processed.

17       Q       And a teller would not do that process,

18    that transaction, before completing the

19    requirements, identification-wise; is that right?

20       A       Should not.  Should not.  It can, but

21    it should not.

22       Q       What do you mean "should not"?

Page 80

1      A      Should not, because along with doing

2    the transaction, I mean, teller can put money out,

3    but it has to comply on policy and procedures, and

4    the policy tells them that for this amount of

5    money, she needs to have two IDs.

6      Q      So that's a condition precedent before

7    they do anything?

8      A      Right.

9      Q      So a customer coming to a teller, a

10   teller would, say, look at these documents,

11   what -- tell you what, rewind.

12            Tell me what a teller would do.

13     A      He would ask the customer for two IDs.

14   In this case, Mr. Banks gave him one, the teller

15   was asking for a second ID.

16     Q      He doesn't present a second, then what

17   happens?

18     A      Then you say we cannot make the

19   transaction.  The customer may complain and say,

20   you know what, I need to talk to the supervisor.

21            The supervisor would come and based on

22   the -- on the customer, you know, the customer --

Capital Reporting Company

1    the teller may make an exception and override.

2        Q    The who may?

3        A    May make an exception and override.

4        Q    Who?

5        A    The teller coordinator.

6        Q    The teller coordinator but not the

7    teller?

8        A    Right.  Because the tellers would have

9    a limit as to how much they can do.

10       Q    What's the limit a teller can do?

11       A    250.

12       Q    When's the first time you saw the

13   encryption on Exhibit 3?

14       A    Which one?  This one up here?

15       Q    No.

16       A    This one?

17       Q    Yes.

18       A    This one?

19       Q    Yes.

20       A    I guess that day of the deposition.

21       Q    Day when --

22       A    Day of the deposition two years ago.

**Capital Reporting Company**

1       Q       And did you talk to the teller after

2    that?

3       A       After I saw this?

4       Q       Yes.

5       A       No.

6       Q       So you didn't have an understanding as

7    to how that encryption occurred?

8       A       Right.

9       Q       And you still don't?

10      A       I don't.

11              MR. TEMPLE:  No further questions.

12              I needed to get copies of these

13        policies.  These documents that are pertinent

14        documents.

15              MS. FREDERICK:  Well, you never served

16        us with a discovery.  Discovery's over.

17              MR. TEMPLE:  Ongoing discovery, there's

18        ongoing discovery here with this particular

19        witness.

20              MS. FREDERICK:  Do you want teller

21        manual, what is it that you want?

22              MR. TEMPLE:  Teller manual.  And the

Capital Reporting Company

1    statements.

2          MS. FREDERICK:  What statements?

3          MR. TEMPLE:  The teller and the head

4    teller, written statements.  The incident

5    report statements.

6          MS. FREDERICK:  Well, I can tell you

7    this.  I know Valentina wrote a statement,

8    but Roxanna never did.  There is no statement

9    from her.

10         But I know I can give you that, I can

11   give you Valentina's statement, and I will

12   check with corporate security to see if they

13   transcribed any over-the-phone statements

14   that may have been made.  I'm not aware of

15   it.

16         MR. TEMPLE:  And whether they have a

17   copy of the video, of course, you have no

18   problem with that?

19         MS. FREDERICK:  I know we don't have

20   the video.  It was given to protect who was

21   representing D.C. at the time and,

22   unfortunately, no one thought to make a copy

Capital Reporting Company

Page 84

1       of it.

2               And I've been -- I subpoenaed them, I

3       was trying to get them to look for it.  Right

4       now they're telling me they don't have it.

5       And he's gone, he doesn't work there anymore.

6               But I think Mr. Jordan had said to me

7       that it's not one continuous video, it's a

8       video of a camera will capture a moment and

9       then a moment and a moment.

10              And it's a video of those moments, it's

11      not you're sitting there and you're watching

12      the guy walk up, talking to the teller, which

13      is what I thought it was.  Apparently it is

14      not that.

15              THE WITNESS:  You see all those

16      cameras, it's snapshots like this.

17              MS. FREDERICK:  And it's a recording of

18      moments in time from each different camera

19      around the bank, that's what it is.

20              THE WITNESS:  That's like when we got

21      teller or anyone who press an alarm, that

22      accelerates it quicker, trying to get as many

Capital Reporting Company

Page 85

1    pictures, but it wouldn't be like a

2    continuous --

3        MS. HUDSON:  Did the prosecutor get a

4    copy?

5        MS. FREDERICK:  I don't know.  I just

6    know that corporate security has a record of

7    giving it to the D.C. -- the guy who

8    represents William Burquette (phonetic), and

9    they never got it back.

10        MR. TEMPLE:  Very well.

11        MS. FREDERICK:  I know that I don't

12    have it, and I'm trying to get it, but

13    they're giving me the runaround.

14        MR. TEMPLE:  Okay.  We can get those, I

15    think, then.  We can go off the record.

16

17        (Signature having not been waived, the

18    deposition of German Jordan was concluded at 11:39

19    a.m.)

20

21

22