UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GEORGE BANKS,**<br>           Plaintiff,<br><br>      v.<br><br>**BANK OF AMERICA, N.A.,**<br>           Defendant. | Civil Action 05-01688  (HHK) |

**MEMORANDUM OPINION AND ORDER**

George Banks brings this action against Bank of America, N.A. ("BofA"), asserting causes of action arising from an incident in which he was involved that occurred inside a BofA branch on June 15, 2002.[1]  Banks's amended complaint alleges four causes of action: negligence, gross negligence, negligent supervision and training,[2] and violation of § 1981 of Title 42 of the U.S. Code.  Before the court is BofA's motion for summary judgment [#26].  Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion must be granted in part, but denied as to Banks's § 1981 claim.

**I.   BACKGROUND**

Banks is the owner of Sentry Security International, Inc. ("SSI"), a business headquartered in the District of Columbia.  On June 15, 2002, he entered defendant's BofA

---

[1] The BofA branch in which the incident occurred is located at 1835 Columbia Road NW, Washington, D.C.

[2] Banks withdrew his negligent training count on February 26, 2007, but his negligent supervision count remains.

branch to conduct a business transaction involving two SSI company accounts that he maintained with the bank. Banks sought to withdraw $1,000 from one account, deposit $700 of that $1,000 into the second account, and keep the remaining $300 for himself. Def.'s Ex. B (Pl.'s Ex. A) at 21–22 (Dep. of Banks, Nov. 6, 2003 ("Pl.'s 2003 Dep.")).[3] When he reached the window of teller Roxanna Fuentes, he handed her completed withdrawal and deposit forms, along with his driver's licence. *Id.* at 23. Fuentes then requested an additional form of identification. *Ibid.* Each party's version of what happened thereafter differs substantially.

At his deposition, Banks testified that he provided Fuentes with two forms of identification and that she was about to disperse $300 to him when the head teller, Valentina Elebesunu, intervened. *Id.* at 23–24. According to Banks, Elebesunu stated that he "did not look like he owned the business" and ordered Fuentes to "reverse the transaction, which she did." *Ibid.* Banks responded by asking, "What do owners of these types of businesses look like?" *Ibid.* At that point, an off-duty D.C. Metropolitan Police Department ("MPD") officer — who was a bank customer waiting in line — approached Banks and asked the tellers if he should escort plaintiff out of the bank. *Id.* at 28:11–15, 30:1–4. At this point, the branch manager, German Jordan, "walked in right away . . . and said, '[L]eave him alone; we will handle it. This

---

[3] Many of the exhibits provided by the parties are portions of deposition transcripts, with each party filing "competing" excerpts of the various depositions taken in this case. When citing to a deposition transcript, portions of which have been filed by both parties, the court will cite first to the exhibits of both parties and then will cite generically the deposition transcript itself. Page numbers refer to the page numbers of the transcripts, rather than of the exhibits.

is a bank issue and, Mr. Banks, go sit down [at] my desk.'" *Id.* at 30:9–13. Jordan did not question plaintiff about the incident but stepped away "so [that] he could inquire from the tellers what happened." *Id.* at 31:2–6.[4]

Jordan didn't hear the tellers' explanation, however, because Banks and the officer were arguing with each other and diverted his attention. Jordan 2006 Dep. at 28–29. Jordan tried to talk with Banks, but Banks "wasn't interested in talking" to Jordan as he was engaged in discussion with the officer. *Id.* at 28, 31, 35. At this point, Jordan said "this isn't working" and instructed the bank's security guard to "get him out of here." Am. Compl. ¶ 11; Jordan 2006 Dep. at 29, 31. The MPD officer then handcuffed Banks (the security guard came towards the scene afterwards) and told the security guard to call the police to have Banks picked up, which he did. Pl.'s 2003 Dep. at 32:20–33:1, 38:12–20. Next, Banks was dragged outside by the MPD officer and forced to wait on the sidewalk until a police car arrived. *Id.* at 38:21–13, 40:2–8.

---

[4] Fuentes provides a substantially different version of what happened. She maintains (along with Elebesunu and Jordan) that Banks never provided a second form of I.D. Def.'s Ex. G (Pl.'s Ex. C) at 32, 35 (Dep. of Fuentes). According to Fuentes, when she explained to Banks that both the $1,000 withdrawal amount and the counter-document he was using required a second I.D., "he started getting upset and cursing, [and] being disrespectful." *Id.* at 33. Fuentes alleges that, in an effort to accommodate Banks anyway by circumventing the bank's policy requiring two forms of I.D., she pulled his profile and asked him various questions to verify that he owned the account. *Id.* at 35–36. However, only head tellers were authorized to use their discretion in this type of situation, which Fuentes was not. Pl.'s Ex. B (Def.'s Ex. F) at 41–42 (Dep. of Jordan, July 31, 2006 ("Jordan 2006 Dep.")). After Elebesunu allegedly overheard Banks being disruptive, she went over to assist Fuentes and confirmed that Banks needed a second I.D. Fuentes Dep. at 36–37; Def.'s Ex. 6 at 28–29 (Dep. of Elebesunu). Furthermore, Elebesunu denies ever telling Fuentes that Banks did not look like he owned the business. Elebesunu Dep. at 38.

Approximately thirty minutes later, Banks was transported to the Third Police District where he was charged with disorderly conduct and detained for four hours. Am. Compl. ¶ 13. The charge was subsequently dropped by the United States Attorney's Office. *Id.* ¶ 16.

## II. ANALYSIS

### A. Negligence And Gross Negligence

"To establish negligence a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *District of Columbia v. Beretta, U.S.A., Corp.*, 847 A.2d 1127, 1134 n.2 (D.C. 2004). Banks contends that BofA was negligent when it allegedly failed to follow its internal banking policies and refused to complete his business transaction. As a result of defendant's alleged negligence, Banks asserts that he was wrongfully arrested by an off-duty MPD officer for disorderly conduct. Banks appears to argue that a standard of care arises solely out of BofA's policies and procedures regarding transactions. According to him, BofA's "[internal banking] policies and [his] business invitee status create the legal framework to establish defendant's duty owed to [him]." Pl.'s Opp'n at 11. As will be seen, this assertion is somewhat correct, but not in the way Banks appears to assert.

#### 1. Defendant's Internal Policies Regarding Transactions

Banks states that his "negligence claims are based upon the bank teller, head teller, and bank manager's actions" in that the BofA employees "failed to properly handle a simple transaction after plaintiff produced appropriate identification."[5] Pl.'s Opp'n at 15. More

---

[5] As noted above, BofA disputes that Banks provided two forms of identification. For present purposes, the court will assume that Banks did in fact produce two I.D.s. However, Banks repeatedly asserts that the type of transaction in which he was involved required only one

specifically, albeit indirectly, Banks suggests that a business's failure to comply with its own internal policies amounts to a negligent breach of the duty of care owed to its customers. Banks fails to cite any authority which imposes such a duty, however.

In *Novak v. Capital Management & Development Corp.*, 452 F.3d 902 (D.C. Cir. 2006), two patrons sued a nightclub for damages incurred when they were viciously attacked in an alley outside of the establishment. The plaintiffs asserted an alternative theory of negligence, arguing that the club had a security policy which mandated patrolling the alleys and that the club failed to follow that policy the night of the attack. *Id.* at 914–15. The crux of the plaintiffs' argument was that the club's failure to abide by its own security policy was sufficient to establish *prima facie* negligence. *Ibid.* Addressing this argument, the appellate court found that the trial court was correct when it determined that no such theory of liability exists. *Ibid.*; *Novak v. Capital Mgmt. & Dev. Corp.*, 2004 WL 4881276, at *5 (D.D.C. July 12, 2004), *rev'd on other grounds*, 452 F.3d 902 (that "[w]hile [a business's non-compliance with its own policies] can be some

---

form of identification. This assertion is simply incorrect. Banks states that "Fuentes has admitted that only one form of identification was required for this particular type of transaction," which is "based upon the bank's policies and procedures." Pl.'s Opp'n at 11–12. However, it appears that Fuentes' testimony may have been taken out of context. Banks failed to attach the relevant question — in its entirety — asked of Fuentes in her deposition. Fuentes Dep. at 20 (stating, in response to a question not appearing fully in the record, that "just one" form of I.D. is required for a particular type of transaction). In any event, BofA's internal guidelines clearly state that two forms of identification are required for over-the-counter withdrawals involving: (1) counter-documents; (2) not-well-known bank customers; and (3) amounts over $500.01. Pl.'s Ex. G at BOA1-028 (BofA's Transaction Guidelines). On the day of the incident, plaintiff's attempted transaction was two-part: before he could deposit $700 into account #2 and receive $300 in cash, he had to first withdraw $1,000 from account #1. Jordan 2006 Dep. at 43–44. Since Banks requested the $1,000 using a counter document (as opposed to a personalized, preprinted form) and was not a well-known customer at that branch, he was required by BofA policy to produce two forms of identification. Pl.'s Ex. F (Plaintiff's Withdrawal Slip); Pl.'s 2003 Dep. at 20:6–18.

evidence of negligence, that in itself is insufficient to show negligence unless plaintiffs also show that non-compliance with policy was also non-compliance with the duty of care").

Here, Banks has failed to establish that BofA owed him a duty of care to comply with its internal policies regarding financial transactions involving its customers' accounts. The court will now address whether defendant breached its duty of care to Banks as a business invitee.

**2. Duty Of Care To Business Invitees**

The principles of law governing the duty of a business establishment with respect to the security of members of the public who are invited to enter and patronize it are well settled. *See, e.g.*, *Seganish v. Dist. of Columbia Safeway Stores, Inc.*, 406 F.2d 653, 655 (D.C. Cir. 1968) (a business invitor's "duty is to exercise reasonable care to keep his place of business safe for customers using it"). A business invitor is liable to customers for injuries caused by its failure to reasonably maintain its premises. *Ibid.* Liability may also arise from a business's negligent failure to safeguard against the harmful acts of its employees or third persons. *Ibid.* However, a business invitor "is not an insurer of customers' safety and is liable only for injuries resulting from his negligence." *Smith v. Safeway Stores, Inc.*, 206 A.2d 264, 265 (D.C. 1965); *see Preston v. Safeway Stores, Inc.*, 163 F. Supp. 749, 751 (D.D.C. 1958).

Banks contends that "the bank enjoyed a duty to protect its depositors . . . from harm and to follow its customer service and transaction policies." Pl.'s Opp'n at 12.[6] He maintains further that BofA's refusal to complete his transaction and instruction to its security personnel to escort him out of the bank, "triggered the involvement of the [off-duty] D.C. police officer and caused

---

[6] Although not entirely clear, it appears that Banks's alleged harm is the harm arising from his arrest by the MPD officer.

[p]laintiff to be arrested," *id.*, and that these "triggering" acts constituted a breach of duty.[7] To support his argument, Banks cites *Viands v. Safeway Stores*, 107 A.2d 118, 120–21 (D.C. 1954) (interpreting the Restatement (First) of Torts § 348 (1939)). In *Viands*, the D.C. Court of Appeals held that:

> [A]n invitor is liable to a business invitee for injury caused by the accidental negligence or intentionally harmful acts of third persons if the invitor by the exercise of reasonable care could have (a) discovered that such acts were being done or were about to be done, and (b) protected the invitee by controlling the conduct of the third persons or giving a warning adequate to enable him to avoid the harm.

107 A.2d at 120–21.

Although Banks succeeds in establishing BofA's duty to exercise reasonable care in protecting him from foreseeable harm, his claim that BofA breached its duty is unconvincing. First, Banks fails to set forth any competent evidence to show that BofA knew, or should have known, that at the time the tellers rejected Banks's attempted transaction an off-duty police officer was present in the bank and likely to intervene. It is worth noting again that at no point did defendant's employees request the off-duty officer's assistance in the matter. Rather, the officer took it upon himself to get involved and subsequently arrest plaintiff. Second, Banks admits that while he was being handcuffed, the bank manager asked the MPD officer to stop.

---

[7] The court notes that although Jordan instructed the *security guard* to escort plaintiff out of the bank, it is undisputed that no such instruction was given to the *MPD officer* — the person who actually effected the ejection — to assist in that process or to arrest plaintiff. The court also notes that when defendant's employees (justifiedly) "asked Banks to leave," Pl.'s Opp'n at 14, Banks's invitee status was revoked and he had no right to remain on the premises. *See Feldt v. Marriot Corp.*, 322 A.2d 913, 916 (D.C. 1974) (finding that when a restaurant patron was ordered to leave for being shoeless, her license was revoked, whether legally or illegally, and she had no right to remain, even though she had paid for and received her food, and her remedy, if any, was a civil action for breach of contract). To be clear, the court is not implying that BofA's duty of care to Banks ended when it requested that he leave the bank. Rather, the court finds no negligence in BofA's decision to ask Banks to leave.

Pl.'s 2003 Dep. at 36:21–37:7. Assuming *arguendo* that the officer's actions were tortious, Jordan's request supports BofA's position that — once aware of plaintiff's arrest — BofA exercised reasonable care by *attempting to control the MPD officer's conduct* and advocating for Banks. *Viands*, 298 A.2d at 120–21. At that point, however, it is apparent that the MPD officer was resolute about arresting Banks, despite the objections from Jordan.

To the extent Banks suggests that BofA is also liable under a *respondeat superior* theory because the bank's security guard was allegedly "aggressively involved in the arrest," Pl.'s Opp'n at 4 n.8, this suggestion fails. Banks describes — in great detail — the MPD officer's apparently solitary role in the arrest. Pl.'s 2003 Dep. at 32:20–36:20, 38:21–39:13. According to Banks, "[t]he only person that was on [him] constantly was the off-duty police officer." *Id.* at 31:14–15. More specifically, Banks states that it was the MPD officer who handcuffed him and that the security guard came towards the scene afterwards. *Id.* at 38:12–14. It was only after the MPD officer told the security guard to call the police to have Banks picked up, that the guard became involved. *Id.* at 32:20–33:1, 38:15–20. Even so, the guard's involvement was limited to calling the police and opening the front door for the officer and Banks, Jordan 2006 Dep. at 34, which does not constitute negligence.[8] Accordingly, for the reasons set forth above, the court will grant

---

[8] Banks states that a BofA security guard "asked Banks to leave and actually used force in that process by placing a hand on Banks's upper arm." Pl.'s Opp'n at 14. However, his sworn testimony contradicts this assertion. Pl.'s 2003 Dep. at 32:20–36:20, 38:12–39:13. Even if the security guard did touch his arm, however, there is authority to support the proposition that such a touching in the circumstances presented here would not be actionable. *United States v. Costello*, 307 F.3d 553, 555 (7th Cir. 2002) ("The ordinary law of property permits a property owner, including a business establishment, to use gentle force to expel a person who refuses without right to leave the premises when told to do so.").

BofA's's motion for summary judgment on Banks's negligence and gross negligence claims.[9]

**B.      Negligent Supervision**

The District of Columbia recognizes the tort of negligent supervision as formulated in the Second Restatement of Agency, which states:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> (a) in giving improper or ambiguous orders or in failing to make proper regulations; or (b) in the employment of improper persons or instrumentalities in work involving risk or harm to others; (c) in the supervision of the activity; or (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

*Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994); Restatement (Second) of Agency § 213 (1957). To establish a claim of negligent supervision, a plaintiff must present evidence "which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a casual relationship between the violation and the harm complained of." *Ibid.*

Banks states that "[i]t is for the same reasons that there is a breach of duty in the negligence claim, that there is a breach of duty to properly supervise in this claim." Pl.'s Opp'n at 18–19. Specifically, Banks alleges that BofA's internal policies regarding transactions and the requisite forms of identification needed to process those transactions, create a legal duty to

---

[9] Since Banks can not establish that BofA had a duty to him (an element of his negligence claim) and breached that duty, he likewise is unable to establish those same required elements with respect to his claim of gross negligence.

plaintiff. However, as the court explains, *supra*, no such theory of liability exists. Because no BofA employee breached a duty to Banks, BofA may be not be held liable for any asserted breach of a duty to supervise its employees.

**C.      Plaintiff's § 1981 Claim**

Title 42 of the United Sates Code, § 1981, prohibits intentional race discrimination in the making and enforcing of contracts with both private and public actors. 42 U.S.C. § 1981. The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). Banks asserts that BofA violated § 1981 by refusing to effect the financial transactions involving his accounts because of his race.

**1.      The Applicable Framework**

In this case, there is no direct evidence of race discrimination. Therefore, the § 1981 claim is governed by the familiar *McDonnell Douglas* analytical framework. *See Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005) (applying *McDonnell Douglas* to § 1981 claims).

Under this framework, it is the plaintiff's initial burden to "prove by a preponderance of the evidence a prima facie case of intentional discrimination." *Clifton Terrace Assoc. v. United Technologies Corp.*, 929 F.2d 714, 722 (D.C. Cir. 1991). To set forth a *prima facie* case of discrimination, a plaintiff must establish that she is: "(1) a member of a protected class; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in Section 1981 (which includes the right to make and enforce contracts)." *Bennett v. U.S. Chess Fed'n*, 468 F. Supp. 2d 79, 86 (D.D.C. 2006). Often, a plaintiff makes out a *prima facie* case by demonstrating that she was treated differently from a

similarly situation person — a requirement BofA seeks to impose on Banks here. But courts have repeatedly emphasized that "[t]he *McDonnell Douglas* framework was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005) (internal quotations omitted). Thus, a plaintiff may also provide sufficient evidence to raise an inference of discrimination in a variety ways. *Id.* at 412–13.

For purposes of evaluating a § 1981 claim in the context of interactions in a commercial establishment, the court will adopt a test originally articulated by Judge Davis in the District of Maryland. *See Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 704–08 (D. Md. 2000). This test (which seeks to be more sensitive to the difficulties plaintiffs face in the commercial/retail context in drawing out evidence of how defendants have treated other customers in similar circumstances) requires a plaintiff to establish that (1) she is a member of a protected class; (2) she made herself "available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided;" and (3) she "did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination." *Id.* at 707. This last requirement may be satisfied by a showing that (a) the plaintiff was "deprived of services while similarly situated persons outside the protected class were not deprived of those services," and/or (b) she "received services in a markedly hostile manner and in

a manner which a reasonable person would find objectively unreasonable." *Ibid.*; *see also Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872–73 (6th Cir. 2001) (discussing and adopting the *Callwood* test in the commercial-establishment context).

Where a plaintiff has satisfied her initial *prima facie* burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *George*, 407 F.3d at 411. When this requirement is satisfied, the plaintiff must then (for purposes of a summary judgment motion) raise a triable issue of fact by pointing to credible evidence that the defendant's stated reason was pretextual and that race was the real reason for the defendant's less favorable treatment of the plantiff. *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999) (observing that usually, proffering "evidence from which a jury could find that [the defendant's] stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury").

### 2. Assessment Of Banks's Claim

Banks alleges that BofA "interfered with the enjoyment of his contract rights and benefits, as well as his rights as a customer, by imposing a different and greater standard upon him as a depositor than that imposed upon non-Blacks." Am. Compl. ¶ 20. In support of his contention, Banks argues that "the facts show a blatant illegal double standard in the form and content of BofA's treatment of [him]." Pl.'s Opp'n at 25. More specifically, Banks states that defendant's White and Hispanic customers have — in the past — become upset with, and raised their voices to, defendant's tellers. Elebesunu Dep. at 65–66. Banks further states that "at no time has the bank security guard handcuffed a White or Hispanic depositor inside the bank." *Id.* at 66.

If Banks were required to show that similarly situated persons had been treated differently by BofA, Banks's effort to establish a *prima facie* case would fail.[10] Under *Callwood*, however, Banks has succeeded in establishing th fourth element of his *prima facie* case by establishing by a preponderance of the evidence that he was treated in a markedly hostile manner.[11] According to his version of the facts, he presented two forms of I.D. as requested but was denied services because the supervising teller did not think he, a Black man, looked like someone who owned a business. Such treatment is objectively unreasonable.

3. **Banks Has Raised A Triable Issue Of Fact Regarding Whether The Nondiscriminatory Reasons BofA Articulates For Its Actions Were Pretextual**

Because plaintiff has established a *prima facie* case, the burden shifts to BofA to articulate a nondiscriminatory reason for its actions. Its response in this regard is to contend that the nondiscriminatory reason was that Elebesunu believed that Banks had not satisfied BofA's I.D. policies for cashing checks. This reason being articulated, the burden shifts back to Banks to

---

[10] Banks's attempt to identify disparate treatment arising out of the use of handcuffs is unavailing for the simple reason that *Banks was not handcuffed by defendant's security guard*, but rather by the off-duty MPD officer who took it upon himself to arrest plaintiff. Pl.'s 2003 Dep. at 32:20–36:20, 38:12–39:13. If the alleged disparate treatment is made manifest by the mere use of handcuffs, plaintiff's claim goes nowhere. Likewise, to the extent plaintiff's claim relies on allegedly different historical treatment of non-Black customers, it fails for lack of evidence. Though Fuentes testified that on many occasions she witnessed BofA's security guard forcibly escorting customers out of the bank who were yelling, screaming, or cussing while inside, Fuentes Dep. at 26, Banks fails to submit any evidence demonstrating that these or any other events manifest any disparate treatment favoring upset customers who were not members of his (or any) protected class. If anything, Banks received more favorable treatment than that given to other upset customers.

[11] He has done so only as to one aspect of the incident at the bank: the refusal to process the transaction after he complied with the teller's request for two forms of I.D. BofA's actions after the intervention of the MPD officer were neither hostile nor unreasonable.

raise a triable issue of fact regarding whether that reason is pretextual for discrimination. Banks has met this burden. The court must view the evidence in the light most favorable to Banks, and viewed through that lens, Banks clearly satisfied BofA's I.D. policies by producing two forms of identification (the validity and sufficiency of his second form of identification is not disputed). Hence, the contention that Elebesunu had any reason, apart from her alleged suspicion that Banks did not "look" like a business owner,[12] to deny Banks the benefits of his contractual relationship with BofA, is not to be believed. More particularly, there is no support among the undisputed facts before the court for the notion that Elebesunu had a justifiable reason to believe Banks had not satisfied the applicable I.D. guidelines. Banks's § 1981 claim, therefore, warrants jury consideration.

### III.  CONCLUSION

For the foregoing reasons, the court concludes that defendant's motion for summary judgment must be granted in part and denied in part. Accordingly, it is this 6th day of September, 2007, hereby

**ORDERED** that defendants' summary judgment motion [#26] is **GRANTED** with respect to each of Banks's claims except his § 1981 claim insofar as it relates to BofA's refusal to process his requested transaction.

Henry H. Kennedy, Jr.
United States District Judge

---

[12] This kind of evidence itself may be a potential manifestation of race discrimination, even when a person expresses such sentiments towards a member of her same race (both Banks and Elebesunu are Black Africans).