# EXHIBIT B

Page 1

```
 1    UNITED STATES DISTRICT COURT
 2           DISTRICT OF COLUMBIA
 3    - - - - - - - - - - - - - - - X
 4    GEORGES BANKS,                 :
 5                                   :
 6                                   :
 7           Plaintiff,              :
 8      v.                           : Case No.:
 9    BANK OF AMERICA,               : 05-CV-01688
10                                   :
11           Defendant.              :
12    - - - - - - - - - - - - - - - X
13
14           The deposition of REGINALD RANDOLPH
15    was held on Thursday, November 30, 2006,
16    commencing at 2:07 p.m., at the law offices of
17    Hamilton & Hamilton, 1900 M Street, NW, before Kim
18    Brantley, Notary Public.
19
20
21    REPORTED BY: Kimberly Brantley
```

Page 2

1  APPEARANCES:
2  DHAMIAN BLUE, ESQUIRE, ESQUIRE
3  Temple Law Offices
4  1229 15th Street, NW
5  Washington, DC 20005
6  (202) 628-1101
7     On behalf of the Plaintiff
8
9
10 JESSICA A. DuHOFFMAN, ESQUIRE
11 MILES & STOCKBRIDGE, PC
12 10 Light Street
13 Baltimore, MD 21202
14 (410) 385-3782
15    On behalf of the Defendant
16
17
18 ALSO PRESENT: GEORGES BANKS, Plaintiff
19
20
21

Page 3

1  Whereupon,
2          REGINALD RANDOLPH
3  called as a witness, and having been first duly
4  sworn to tell the truth, the whole truth and
5  nothing but the truth, was examined and testified
6  as follows:
7         EXAMINATION BY MS. duHOFFMAN:
8     Q.  Can you please state your name.
9     A.  My name is Reginald D. Randolph, Pastor
10 Randolph.
11    Q.  And what would you prefer I call you
12 through this deposition, pastor?
13    A.  You can call me pastor, reverend, Mr.
14    Q.  Mr., doesn't matter?
15    A.  Doesn't matter. As long as it's not
16 what they used to call me.
17    Q.  Pastor, have you ever had your
18 deposition taken before?
19    A.  I used to work for the courts, so, yes.
20    Q.  You have had it taken; you've been a
21 witness?

Page 4

1     A.  Yes, yes.
2     Q.  Just to remind you of the rules, the
3  court reporter is taking down everything we say,
4  so we can't speak over each other. To the extent
5  that you start to predict what the end of my
6  question is, just let me get it out so the record
7  is clear.
8     A.  Absolutely.
9     Q.  If you don't understand a question I
10 have asked, just ask me to rephrase it. I don't
11 always ask the best questions. You're not going
12 to embarrass me or hurt my feelings.
13    A.  Okay.
14    Q.  If you do answer it, I'm going to
15 assume you understood the question and you
16 answered it truthfully.
17    A.  Okay.
18    Q.  To the extent that you need a break, I
19 don't expect that we will be here long, but to the
20 extent you need a break, please let me know. We
21 will break. But I'll ask that a question not be

Page 5

1  pending prior to your break.
2     A.  Okay.
3     Q.  Do you understand the rules?
4     A.  Yes, I do.
5     Q.  Do you have any questions?
6     A.  No, I don't.
7     Q.  Okay.
8     Q.  Can you give me a thumbnail sketch of
9  your educational background?
10    A.  I graduated from Howard University,
11 1978, bachelor degree in psychology. Then I
12 graduated from Logos College, out of Florida,
13 1990, masters degree in Christian counseling.
14 I've been trained and licensed as a licensed
15 professional counselor with the Department of
16 Mental Health. I'm a licensed and ordained
17 minister in the Biblical College, which is a local
18 college as well as other, from DC Superior Court
19 and other training, dealing with post-traumatic
20 stress syndrome, family counseling, individual
21 counseling. So it's extended training after I

Page 6

1  worked for the court.
2      Q.  And when was it that you worked for the
3  court?
4      A.  I worked for the court from 1986 to
5  1996.
6      Q.  And that was the Superior Court of DC?
7      A.  DC Superior Court.
8      Q.  And what was your title there?
9      A.  I was a probation officer, in holding
10 different positions within the Department of
11 Social Services.
12     Q.  You indicated that you were trained by
13 the superior court?
14     A.  Yes.
15     Q.  For PTSD?
16     A.  PTSD, training and also -- well, yes,
17 go ahead, I'm sorry.
18     Q.  That's all right.  You were trained in
19 PTSD.  What kind of training did you attend?
20     A.  It was ongoing training where they
21 would bring in professionals and teach you how to

Page 7

1  work with families who are under stress, admin
2  youth, individual male, individual and family
3  counseling, also child abuse counseling.  So there
4  was ongoing training through the court.  There
5  were licensed professionals from different
6  universities or areas of training.
7      Q.  Did you get certificates of any sort?
8      A.  Yes, I got plenty of certificates in my
9  office.
10     Q.  And are these certificates just that
11 you completed certain training programs?
12     A.  Certain training programs, certain
13 courses in order to continue working as an
14 individual family counselor for the court, as well
15 as with child abuse cases.
16     Q.  In the court, and I don't want to
17 misparaphrase what you have testified, did you
18 largely work with family in the family counseling
19 center?
20     A.  I largely worked with families -- I
21 worked with a combination of families for five

Page 8

1  years, child abuse for a year, DWI's for a year.
2  I was there for ten years, so I worked a
3  conglomeration of different positions.
4      Q.  And when you worked with families in
5  child abuse, were you in the position of
6  counselor?
7      A.  I was in the position as a counselor,
8  trained as a probation officer, trained as a
9  counselor.
10     Q.  So your main job was a probation
11 officer, but you did counseling attendant with it?
12     A.  At the time -- can I explain it to you?
13     Q.  Yes.
14     A.  At the time that I started with the
15 court, we have specific areas of concentration and
16 expertise.  Because of my training and my
17 Bachelor's degree and my training in different
18 positions before I came to the court, I qualified
19 to be trained as a family counselor.
20     Q.  Okay.
21     A.  So, but that was one of my expertises

Page 9

1  for over five years.  So we did, the Department of
2  Social Services actually provides the service for
3  their clients, in-house services, they trained
4  their staff.
5      Q.  And your PTSD training, is that as it
6  applies to family counseling and families crisis?
7      A.  As it applies to individual or family.
8      Q.  And if it applies to individual, what
9  type of traumatic events did you have experience?
10     A.  Death, grief, neglect, criminal, any
11 kind of traumatic incidence, any incident which
12 you would consider traumatic to someone's life.
13 Can I add something to that training I forgot?
14     Q.  Sure.
15     A.  I also work with several foster care
16 agencies, which also trained us in working with
17 families, individuals in terms of also providing
18 ongoing training.  So once I came out of the
19 court, because I was called to minister, so I have
20 my own counseling and my own ministry, I also work
21 with several foster care agencies within the

Page 10

1  District of Columbia?
2      Q.  And you still work for them?
3      A.  I am a contractor with a couple of
4  foster care agencies.
5      Q.  What are those agencies?
6      A.  One is named Seraaj Foster Home,
7  S-e-r-a-a-j, as well as I work with E.A.P.,
8  Businesses Employment Assistant Program. So I'm a
9  contractor as well, for different agencies as
10 well. Because of my licensure, I can do my own
11 independent counseling.
12     Q.  And the license you have is a social
13 worker?
14     A.  It's a licensed professional counselor,
15 LPC, on a masters level. So right before you get
16 to a psychiatrist or psychologist, I can provide
17 any type of counseling before, except I don't deal
18 with the medication piece.
19     Q.  And is that in DC?
20     A.  That's in DC.
21     Q.  And your license, when did you obtain

Page 11

1  that?
2      A.  I obtained my license in -- I want to
3  say 1999, something like that.
4      Q.  And did you have to complete courses in
5  an exam?
6      A.  Because of the training I got through
7  the court, and because of the classes I have
8  taken, they grandfathered me in. They looked at
9  my qualifications and my training, my expertise,
10 and they grandfathered me in back in nineteen -- I
11 can't think off the top of my head. It's on my
12 resume. I didn't bring it with me.
13     Q.  So you didn't have to take a test or
14 anything though?
15     A.  No, I didn't to take a test.
16     Q.  And when did you get your masters
17 degree?
18     A.  I got my masters degree in nineteen --
19 I think 1990. It has to do with Logos College.
20     Q.  And your masters degree, did you focus
21 on any particular area of concentration?

Page 12

1      A.  Pastoral counseling.
2      Q.  Pastoral?
3      A.  Pastoral counseling, working with
4  people who are under stress, spiritual needs,
5  growth, family individual.
6      Q.  After the court -- after you worked for
7  the court, you started your own business?
8      A.  Yes. I started my own business and
9  ministry, so I have a dual role. I'm a licensed
10 ordained minister as well as a licensed
11 professional counselor. When I definitely meet
12 the spiritual needs, as a minister and as life
13 professional counseling, I deal with the mental
14 health, so I have to go to the regulatory laws and
15 procedures with the Department of Mental Health.
16     Q.  How would you say you split your time
17 between the two -- the ministry and the mental
18 health counseling?
19     A.  It depends on what the person's need
20 is. If I -- my own personal -- my livelihood
21 comes through my licensed professional counseling.

Page 13

1  Being an ordained minister as a pastoral
2  counselor, I work with anybody, whether they have
3  money or not.
4      Q.  Do you have like a Sunday church or
5  something that you --
6      A.  Well I had a Sunday church for six
7  years. I have what they call an outreach center,
8  where people call in or come in who have needs.
9  I work with other churches in the area too.
10 Because of my expertise in counseling, they call
11 on me or I -- you know, they recognize me. I
12 either go speak or help the other ministries build
13 tutoring programs, counseling, family counseling,
14 so they actually send them to me as the outreach,
15 so I help people with emotional -- sorry, I'm
16 talking too much. Go ahead.
17     Q.  No, no, finish.
18     A.  I hope people with the emotional,
19 spiritual and mental needs.
20     Q.  You don't actually minister a church
21 every Sunday?

Page 18

1   A.   Yes, right.
2   Q.   Have you been asked to testify as an
3   expert in this case?
4   A.   I don't understand what you are saying.
5   Q.   Has anyone from Mr. Banks' lawyer's
6   office called you and offered --
7   A.   No.
8   Q.   To pay you?
9   A.   No.
10  Q.   Have you been, other than for being --
11  for treatment, have you been paid by anyone to
12  review any records or testify or come here today?
13  A.   No, I haven't been paid for any of
14  that.
15  Q.   Have you ever been recognized as an
16  expert in post-traumatic stress disorder?
17  A.   I have never been to court, recognized
18  in court, but I have referrals made to me because
19  of my expertise. So, no, I haven't been in court
20  recognized.
21  Q.   Have you ever been a party to a

Page 19

1   lawsuit?
2   A.   No.
3   Q.   And I just have to ask, have you ever
4   been a defendant in a criminal action?
5   A.   Have I ever been a defendant?
6   Q.   Have you ever been found guilty of a
7   crime?
8   A.   Oh, no, oh, no.
9   Q.   Do you have any prior experience with
10  Donald Temple or his office?
11  A.   No.
12  Q.   How did you come to know Mr. Banks?
13  A.   Mr. Banks and I share the same office
14  building. I met Mr. Banks as he was starting his
15  security business and I, being a minister, he
16  would come down and we would talk and I would
17  encourage Mr. Banks, and he would ask for
18  encouragement and spiritual guidance and
19  counseling as he was starting a business in the
20  neighborhood that really needed some support.
21  Q.   And when did you start sharing office

Page 20

1   space or an office building?
2   A.   No, he's in the same building. He has
3   an office in the same building I have.
4   Q.   What year did you meet?
5   A.   I actually met him around maybe the
6   year 2000, maybe 2001. I actually met him before
7   all this came about when he started -- I started
8   my ministry and counseling service, and we kind of
9   ran across each other in the same hallway. I just
10  can't remember exactly, but he always -- he
11  recognized I was a minister and he is a very
12  Christian guy, spiritual minded guy and he would
13  ask me for my advice and counseling as he was
14  starting his business.
15  Q.   Okay, and when did he ask you to give
16  him spiritual counseling regarding his business?
17  A.   I think maybe 2001.
18  Q.   How long did you give him spiritual
19  counseling regarding his business?
20  A.   Up to today, up to the present.
21  Q.   Do you ever see him from the secular

Page 21

1   side? To the extent that your job is twofold, one
2   is a secular counseling and one is a spiritual
3   counseling, I know it's hard to separate those,
4   but would you say you saw him more as a spiritual
5   counselor or more as a psychological counselor?
6   A.   I saw him more as a spiritual
7   counselor, because of his spiritual background.
8   It was recently, you know, when he told me about
9   what happened, that I was trying to help him in
10  both areas. But mostly spiritual, scriptures,
11  prayer.
12  Q.   How recently would you say you have
13  been trying to do both?
14  A.   The last year or two.
15  Q.   Of 2005?
16  A.   Yes, 2004, 2000 -- can I explain, like
17  you said, it's difficult at times, so you give
18  them what, the spiritual and a prayer, and they
19  definitely want that. He's a very moral person.
20  That's why I'm here. I really want to support
21  him, and he's a very moral minded person,

Page 22

 1  Christian person. But at the same time I can see
 2  at times, you know, he's building a business. He
 3  needs that kind of stress-reducing kind of therapy
 4  or counseling.
 5      Q.  Related to his business?
 6      A.  Yes. So basically it's all pastoral.
 7  It depends on how the person wants it.
 8      Q.  So if I came to you, hypothetically,
 9  stressed out about my job as a lawyer and I wanted
10  spiritual counseling, what are some of the things
11  that you do as a spiritual counselor?
12      A.  A spiritual counselor I would be more
13  Bible based. I would still give you the secular
14  piece also, but I'd give you more Bible based
15  prayer, descriptors, because you are saying you
16  are requesting spiritual counseling, then you are
17  saying, you know -- I ask you, you know, whether
18  you believe in the scriptures, "Do you believe in
19  prayer, do you believe in this," and then I share
20  with you what the word of God says, encourage you,
21  build you up spiritually. If I see that you are

Page 23

 1  stressed as well on the job, because on the job, I
 2  just give you my philosophy --
 3      Q.  That's what I want.
 4      A.  If I am talking too much, cut me off.
 5      If I know you deal on the job, you
 6  can't go around speaking and praying out loud, I
 7  give you the coping skills, how to deal with
 8  conflict, how to deal with stress, how to
 9  develop -- modify your coping thoughts, how to
10  build up your -- the coping thoughts and coping
11  skills.
12      Q.  Do you do in your practice any
13  diagnostic assessments of people?
14      A.  I do what you call minor diagnostics.
15  If I feel that the extremely difficult cases, I
16  generally refer you to a psychologist or
17  psychiatrist, depending on what your job needs.
18  You see if your job needs someone who can give you
19  an intensive diagnostic evaluation, psycho --
20  psychological evaluation, and they request a
21  psychiatrist or psychologist, I would send you

Page 24

 1  there. If they need a -- if you came to me
 2  already knowing your issues and concerns, I do a
 3  minor diagnosis and write it down, or just listen
 4  to you and go forward.
 5      So it depends on what you need from
 6  your business or what you need personally. A lot
 7  of people are really not concerned when they come
 8  to me spiritually. They don't need an evaluation
 9  or psychological.
10      Q.  If someone comes to you with
11  depression, undiagnosed depression, ups and downs,
12  do you make diagnoses whether they suffer from a
13  depressive disorder or is that something that you
14  would refer them out?
15      A.  They come to me with depression, it
16  depends what form they come to me for.
17      Q.  Not the spiritual.
18      A.  Spiritual, I can discern. I've been
19  trained to discern and evaluate the spiritual
20  piece. That's why, it's a calling from God, plus
21  the expertise from the biblical training I have.

Page 25

 1  So if they are coming from that aspect, yes. If
 2  they are coming from the secular point of view,
 3  and I can see through talking to them, and they
 4  say they are depressed, then I don't need an
 5  evaluation. I automatically know how to get them
 6  to the coping skills, and all that.
 7      Q.  If someone is at a point where they are
 8  suffering waves of depression and are having
 9  suicidal thoughts, do you refer them out?
10      A.  Yes, if it's suicidal and they need
11  someone and if they don't believe in the spiritual
12  piece that can help them. You see there is a
13  spiritual, piece, you're saying it's spiritual.
14  If they are coming from a secular point of view,
15  and I feel that I am not capable, I think they
16  need more extensive help, I always refer them to a
17  support person or refer them to a psychologist or
18  psychiatrist. I ask them do they have one on
19  their job or whatever.
20      But from a spiritual piece and they are
21  believing in the word of God and the scriptures,

Page 30

1  or whatever he needs.
2    Q.  In 2000, was Mr. Banks married?
3    A.  Yes, he was married in 2000.
4    Q.  Did you ever hear him talk about his
5  family, give him any spiritual counseling
6  providing --
7    A.  The whole gamut. He was just like an
8  individual who was sharing what he was going
9  through and I was trying to give him pastoral
10 counseling.
11   Q.  So that would include family issues?
12   A.  Family issues, whatever.
13   Q.  That would include money issues?
14   A.  Money issues if I could.
15   Q.  And of course religious issues?
16   A.  Definitely religious, spiritual.
17   Q.  And you talked about the business
18 encouragement issues?
19   A.  Encouragement, role issues.
20   Q.  Did he ever talk about suffering
21 anxiety or depression related to starting a

Page 31

1  business and having a family?
2    A.  Yes, he always -- that's why I gave him
3  counseling. You can tell he was definitely trying
4  to keep his business afloat, not only keep his
5  business afloat. He was still trying to help the
6  other communities. He was trying to help
7  everybody, which is something which would bring
8  stress to anyone who doesn't have financial
9  support in that sense, everybody giving him money.
10   Q.  Did you give him any coping skills how
11 to deal with the attendant anxiety and depression?
12   A.  That's why we prayed. That's why I
13 have scriptures. I have scriptures helping
14 patients deal with anger, love. Because you know,
15 people don't always treat you fair when you start
16 your business. They always say they will support
17 you and they don't support you. Encouragement,
18 that kind of thing, to get contracts with his
19 business.
20   Q.  Did he ever indicate in 2000 when you
21 were talking about these things, did he have any

Page 32

1  anger issues attendant with some of the issues of
2  starting a business and having a family and being
3  in a neighborhood to try and help?
4    A.  I call it more frustration, as you are
5  trying to start a business and keep it afloat and
6  do things with it. You're still dealing with
7  all -- not only professional issues. You're
8  dealing with personal issues and you want things
9  to go right, and they don't always happen.
10 That's where spiritual counseling again let's them
11 know, know, it can happen, hope, patience.
12   Q.  What were some of the family issues
13 that you recall he was suffering in 2000, 2001
14 that he talked to you about?
15   A.  I know he was married and he talked a
16 little bit about his wife and not being
17 together -- just trying not, trying to work two
18 ends of those things together. And I just tried
19 to encourage him, you know, to stay focused, you
20 know, to the best he can.
21   Q.  Were they having marital difficulties?

Page 33

1    A.  I don't really know how much that was,
2  because once again, I just give him overall
3  counseling, you know. Back when we were
4  establishing the relationship, so you know in your
5  former relationship you don't want to get too
6  intrusive on every matter, every little bit of
7  matter, but he did share enough with me to let me
8  know he's dealing with marital situations, trying
9  to have a wife, trying to keep a wife, so overall,
10 a lot of things that people go through.
11   Q.  Did he ever say he was happily married
12 or unhappily married?
13   A.  I don't remember. He just said he was
14 married.
15   Q.  Do you recall that he said he had any
16 kids, children?
17   A.  I don't recall any kids.
18   Q.  Does Mr. Banks still share an office in
19 your building?
20   A.  Yes. I -- yes, he does.
21   Q.  Do you still give him encouragement

Page 38

1  going to want copies of all this stuff, I'm sorry.
2  And we can do it in a minute.
3     A.  Okay.
4     Q.  When did he first bring up the incident
5  with you about the bank?
6     A.  It was in July.
7     Q.  Fourth of July?
8     A.  July the -- from my record, let me make
9  sure, July the 3rd.
10    Q.  Of what year?
11    A.  2003.
12    Q.  Do you know when the incident occurred?
13    A.  I think it was in July, 2002 or
14  something like that.
15    Q.  So he came to you a year later?
16    A.  About a year later or something like
17  that, because we had already been seeing each
18  other.
19    Q.  But the first time he mentioned the
20  incident to you was July of 2003?
21    A.  I think July 2003, or -- July 2003 or

Page 39

1  July 2002.
2     Q.  Well you had been seeing him, did you
3  keep record from the time you started spiritually
4  counseling him from 2002 to 2003?
5     A.  I really didn't keep a lot of records,
6  because it was so ongoing and because of his job
7  and the crisis that was going on.  I would set
8  times and see him, sometimes I see him on the days
9  I see him.  We would set times for Thursdays.  He
10 will see me for some Thursdays and because of
11 contracts and he had to go talk to people, we
12 might see each other Friday, then we might see
13 each other Saturday, so at least every two weeks.
14    Q.  So you would see him every two weeks?
15    A.  It's supposed to have been every two
16 weeks, if we could.  Some time it was weekly.
17 Remember, this is ongoing from 2000, whatever.
18    Q.  Did you charge him prior to 2003?
19    A.  I didn't charge George.  Georgia alot
20 of time didn't have money.  He was building his
21 business.  I wasn't really concerned --

Page 40

1     Q.  Did he ever pay you?
2     A.  No, he did not pay me.  I never really
3  asked George for money.  George said when he gets
4  money, he will help me or he will bless the
5  ministry, but my goal was to help George.  In the
6  spiritual piece, we don't worry about that as much
7  if we know his situation and what he is trying to
8  do.
9     Q.  In July of 2003, what did he tell you
10 about the incident?
11    A.  He said at the bank he was arrested and
12 accused of not having any money.  He was accused
13 of not being the person who had the account at the
14 bank, and it escalated where that they ended up
15 arresting him and he was just devastated by the
16 events going on, and he was very stressed out and
17 overwhelmed about that.
18    Q.  Did he tell you how the arrest
19 happened?
20    A.  At the bank someone -- I mean, he told
21 me the incident that the bank teller wouldn't give

Page 41

1  the money or accused him, he didn't have this
2  account because of the way he looked or whatever,
3  or something, and then it escalated where they
4  were telling him to leave or something, and he --
5  the next thing you know he was arrested and
6  basically attacked and arrested.
7     Q.  Did he say who attacked him; the police
8  officer?
9     A.  I don't know whether it was a police --
10 it had to be the police.  I don't think it was
11 the -- he said someone called the police and the
12 police ended up there.
13    Q.  Did he express any feelings to you that
14 he thought he had been discriminated against?
15    A.  The major thing that I focused on was
16 the way George looked overstressed and he looked
17 so worried and he felt like he was so abused
18 because, you know, people -- he didn't understand
19 what went on, why it had to go that way.  So he
20 was very stressed out, why the bank teller, why
21 the bank manager, why the whole incident got to

11 (Pages 38 to 41)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

e61e5025-c9bd-4fee-8cfd-32c72eeffc55

**Page 42**

1  the point where he ended up handcuffed and taken
2  to jail. So when I looked at George, I saw a man
3  who was under severe stress, post-traumatic stress
4  syndrome. He wasn't his self.
5      Q.  But when he talked to you about it was
6  a year later. You are saying he presented with
7  severe stress and post-traumatic a year after?
8      A.  I think it had been ongoing.
9      Q.  He talked to you the whole year and he
10 never brought it up?
11     A.  I'm trying to think it was July 2002
12 that he talked to me. It might have been July
13 2002, but he needed the formalized counseling as
14 he was going through this allegation. He told me
15 in July 2002 while it was going on, but he needed
16 formalized counseling or something to occur.
17     Q.  When did that occur?
18     A.  The formalized counseling?
19     Q.  Yes.
20     A.  In terms of when I got him the conflict
21 resolution books and all that, that happened in

**Page 43**

1  July -- well we set up dates January the 3rd,
2  2003.
3      Q.  So it was January of 2003 is when you
4  officially started --
5      A.  The formalized counseling, because he's
6  ongoing getting the spiritual piece.
7      Q.  So you were giving him spiritual
8  counseling for this?
9      A.  Right, right.
10     Q.  Now at what point did you assess him as
11 being post-traumatic stress disorder?
12     A.  Because it seemed like any time --
13 post-traumatic means that for a period of time you
14 don't come out of it. It affects you for a long
15 period of time.
16     Q.  So what did you do -- what are some of
17 the things you asked him to come to this
18 diagnosis?
19     A.  Well I have asked him how did he feel
20 about the incident? "How were you able to
21 overcome it? Do you still have feelings about

**Page 44**

1  it? Are you under any stress? Does it bother
2  you mentally or emotionally?" So I verbally asked
3  him.
4      Q.  What did he say to these questions?
5      A.  Yes.
6      Q.  And when did you ask him these
7  questions?
8      A.  When did I ask him?
9      Q.  Yes.
10     A.  I asked him at the time he wanted to
11 set up the actual formalized training.
12        (Records were marked Deposition
13 Randolph Exhibit 2, for identification.)
14 BY MS. duHOFFMAN:
15     Q.  I'm showing you what's been marked as
16 Exhibit 2. These are records that your office
17 produced to us upon a subpoena demand. These
18 records begin with 7/21/03.
19     A.  Um-hum.
20     Q.  You testified earlier that your
21 formalized counseling sessions began in January of

**Page 45**

1  2003.
2      A.  Um-hum.
3      Q.  Where are those records? Because these
4  records start with July, 2003?
5      A.  Excuse me, we made an agreement to
6  start -- I didn't keep records. I didn't keep
7  records.
8      Q.  Did you keep any notes as to what you
9  asked him, what his responses were?
10     A.  Basically it was no, spiritual
11 counseling, I really don't keep a lot of notes.
12 I just keep dates, you know, all my calendar dates
13 for him to see me, but I don't keep formalized
14 notes.
15     Q.  How many people do you see in a day for
16 counseling?
17     A.  I may see up to sixteen, fifteen, in a
18 day. Once again, with George -- excuse me, you
19 didn't ask, once again with George it didn't
20 matter to me whether I got paid or not.
21     Q.  With your other people who come for

12 (Pages 42 to 45)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

e61e5025-c9bd-4fee-8cfd-32c72eeffc55

Page 46

1  counseling, do you keep notes on them?
2      A.  I keep notes on most of them, yes; the
3  spiritual piece, no.
4      Q.  People who come to you for secular
5  counseling, crisis counseling, do you keep notes?
6      A.  Some of them; some of them I don't.
7      Q.  Is there a standard in the agency for
8  keeping notes on your counseling?
9      A.  It depends on what the agency requires
10 me to do. George again was not referred to me
11 from an agency. If Mr. Temple is someone from
12 your agency and says George needs this
13 specialized, I would have kept the notes, but
14 George is already on my counseling list, so I just
15 provided what I thought George would need.
16     Q.  Can you tell from your records that you
17 have when you diagnosed him as suffering -- have
18 you diagnosed him as suffering post-traumatic
19 stress disorder?
20     A.  I have diagnosed George as suffering
21 severe stress due to the traumatic incident that

Page 47

1  happened to him.
2      Q.  Do you know if you have diagnosed him
3  as having PTSD?
4      A.  No, I haven't.
5      Q.  The severe stress that you are
6  associating with this incident at the bank, when
7  did you diagnose him as having severe stress?
8  Can you tell from your records?
9      A.  Probably around July the 21st.
10     Q.  A year later?
11     A.  Yes, because that's when he told me
12 that. If you're not over what happened with you,
13 then you are dealing with what is called
14 post-traumatic stress syndrome.
15     Q.  Did he ever tell you that he was
16 involved in a lawsuit relative to this matter?
17     A.  Did he tell me he was involved in a
18 lawsuit?
19     Q.  That he sued the bank.
20     A.  He told me that he was in the process
21 of suing the bank.

Page 48

1      Q.  Did that affect your counseling at all?
2  Was that significant in your counseling?
3      A.  Only thing I know is that if you are
4  suing the bank -- no, it didn't affect my
5  counseling. I didn't know that I needed records.
6  This is, spiritual counseling, you kind of work
7  them up. I've been working with George a long
8  time. I just provided.
9      Q.  What you were providing to George,
10 would you say that you were spiritual counseling
11 him or were you counseling him for his severe
12 depression?
13     A.  Because of George being a spiritual
14 person, and this is where it gets confused in
15 people's eyes, being a spiritual counselor as well
16 as being a secular counselor, George's focus was
17 on the spiritual piece. So I focused on the
18 spiritual piece but I also provided secular
19 material to him to help him keep abreast of
20 conflict.
21     Q.  Would you say you spiritually counseled

Page 49

1  him in large part and then just gave him materials
2  on coping?
3      A.  I did both.
4      Q.  You also counseled him -- maybe you can
5  help me out.
6      A.  My type of counseling is
7  spiritual/secular. Because I understand he's a
8  spiritual-minded person, my major focus was
9  providing spiritual counseling, but at the same
10 time I would go over with him how to think
11 positive through positive thoughts, and all that
12 stuff, because he also was dealing with the
13 secular world. So I --
14     Q.  What were some of the positive thoughts
15 you told him?
16     A.  "No matter what's done to you, you're
17 still a good person. Getting upset won't help
18 you. Stay calm, cool and collected. That's their
19 opinion. You know, whatever their opinion is does
20 not tell -- make you a" -- his self esteem was
21 damaged. His self esteem was really, really

13 (Pages 46 to 49)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

e61e5025-c9bd-4fee-8cfd-32c72eeffc55

Page 54

1  emotions of hurt and pain.
2      Q.  And this was in July of 2003?
3      A.  This was in the time he told me about
4  the incident.
5      Q.  And when was that?
6      A.  When was that time?
7      Q.  Yes.
8      A.  When he told me about the incident.
9      Q.  Can you tell from your records when the
10 first time was he told you about the incident?
11     A.  It was the earlier part of July.
12     Q.  July of what year?
13     A.  It was the early part of July that he
14 told me he was still affected about what happened.
15     Q.  So July of 2003?
16     A.  Right.  That's traumatic stress
17 syndrome, when you cannot overcome what happened
18 to you.
19     Q.  I'm trying to get an understanding of
20 what you -- based on what he has told you what you
21 understand the incident was that happened at the

Page 55

1  bank.
2      A.  Once again, he felt he was
3  discriminated -- did you ask me a question, I'm
4  sorry?
5      Q.  Yes.  I'm trying to get an
6  understanding of what your idea was the incident
7  was based on, what he told you during counseling
8  sessions.
9      A.  He told me he was discriminated
10 against, he had his proper I.D., he gave the
11 proper I.D., and the lady said, "You don't look
12 like" -- I didn't bring the written, so I'm giving
13 you an estimate of what I remember him saying to
14 me.  That he thinks he don't look like somebody
15 who can own a business, and from there it
16 rolled -- just like a rolling affect of, "You
17 ain't worth this, you're not this and that," and
18 the next thing I know --
19     Q.  And that's when he said the lady said
20 at the bank --
21     A.  He tried to explain it to everybody

Page 56

1  there, and before that the police came and it got
2  out of control and he was arrested.
3      Q.  Did he say who called the police?
4      A.  I don't know if it was the bank
5  manager.
6      Q.  Did he ever say there was an undercover
7  agent standing in line who arrested him on his own
8  accord?
9      A.  Undercover agent?
10     Q.  Standing in line at the bank.
11     A.  I don't remember that.
12     Q.  He didn't tell you that?
13     A.  I don't remember.
14     Q.  Did you keep any notes?
15     A.  I basically work with George.
16     Q.  So everything you know, that you're
17 saying here today, is based on your memory from
18 what he told you three years ago?
19     A.  Well, we talk about it now.
20     Q.  Does he talk about his case to you?
21     A.  His case in terms of?

Page 57

1      Q.  This litigation.  Does he talk about
2  that with you?
3      A.  And what's going on?
4      Q.  Um-hum.
5      A.  All I know is George says he still
6  needs counseling and, you know, eventually I
7  referred him to get some more counseling.
8      Q.  Where did you refer him?
9      A.  He told me that he went to a
10 psychiatrist, a psychologist and I agreed, that
11 was fine with me.  I still would provide that.
12     Q.  When did you --
13     A.  About a month ago.
14     Q.  So now four years after he's going to a
15 psychologist or psychiatrist?
16     A.  That's traumatic stress syndrome.
17     Q.  Do you know who he's seeing?
18     A.  Doctor Jones, or someone, Victor Jones,
19 someone like that.  He told me the name, and I
20 said, fine.  I was always there for him for
21 spiritual counseling.

Page 58

1   Q.  He's now seeing a spiritualist for the
2 secular?
3   A.  He's seeing a therapist for secular.
4 He asks me on call.  I'm on call, ongoing whenever
5 he needs to see me, I'm always there because we're
6 in the same building.
7   Q.  You said you didn't charge him before,
8 why in July 21st, 2003 did you start keeping
9 records of an invoice?
10   A.  Well he asked me for an invoice.
11   Q.  Why did he ask you for an invoice?
12   A.  He said he wanted to pay me back for
13 the services that he couldn't pay me back for.
14 So I provided an invoice.
15   Q.  And when did you provide this invoice
16 to him?
17   A.  The date is at the top, July the 24th.
18   Q.  You provided this on July 24th, 2006.
19 Did you already have a record or is this something
20 you created July 24th, 2006?
21   A.  What George wrote down, what I call

Page 59

1 little things I put on my calendar, but George
2 had -- I really didn't have any records.  I
3 basically talked to Mr. Banks and I talked, we
4 know dates and times.  We know times we met.
5   Q.  So this is an estimate of how long?
6   A.  It's all an estimate.  Once again it's
7 an estimate.
8   Q.  So this was not kept at the time of the
9 treatment at or near the time of the treatment?
10   A.  No, no.  Estimate, strictly estimate.
11   Q.  It was based on your discussion with
12 George recreating the time?
13   A.  Right, right.  We had a contract where
14 we were supposed to meet Tuesday and Thursday and
15 we created the time.  Sometimes we met Saturday.
16 It was on-call for George and I.
17   Q.  So you would never know exactly when
18 you would meet because he would change it?
19   A.  He would change it in the contract or
20 whatever.
21   Q.  Like the first one, this record was

Page 60

1 created July 24th, 2006, but yer for the July
2 21st, 2003 entry, which was three years prior, you
3 have one hour and five minutes.  How did you come
4 up with an exact number?
5   A.  Generally we meet for an hour.
6   Q.  Where does the five minutes come from?
7   A.  Generally we meet for an hour.  I talk
8 to George about it.
9   Q.  Were some of these numbers at times
10 given to you by George?
11   A.  Yes.
12   Q.  How about the rate?  I see sometimes
13 it's a hundred dollars and sometimes it's fifty
14 dollars, sometimes -- how do you come up with what
15 you're charging a rate for?
16   A.  Well, I usually -- George wanted to
17 repay my ministry for all the work I've done with
18 him.
19   Q.  Since 2000?
20   A.  Just 2003, 2003.  From 2003.  Can I --
21   Q.  Sure.

Page 61

1   A.  2003, George always wanted to pay me
2 back for what I have done, always wanted to
3 contribute back for all the counseling that I have
4 done.
5   Q.  Does this rate include kind of a
6 payback for the work you had done from 2000 to
7 2003, all the spiritual counseling and --
8   A.  Everything.
9   Q.  Okay.
10   A.  Probably more than that.  Excuse me for
11 saying that.  But it's not about money.  And can I
12 say something for the record?  It's not about
13 money.  He needed this because he needed something
14 to show that he was in counseling.  For me it's
15 not about money.
16   Q.  Did he say he needed it for his
17 lawsuit?
18   A.  He needed it to show that he was
19 receiving counseling.
20   Q.  Did he say he needed it to show he was
21 receiving counseling for his lawsuit?

Page 62

1  A. Well, I didn't know about the lawsuit.
2  But he said he needed to show that he needed this
3  counseling.
4  Q. Has he ever paid you any of this money?
5  A. No.
6  Q. Have you sent any demands for any of
7  this money?
8  A. I don't have demands for George Banks.
9  Q. You have this on your books as an AR?
10 A. I put it over on the side, put it in my
11 file. If he can, he can; if he can't, he can't.
12 If he does he does. It doesn't matter to me,
13 because George Banks, I will provide free
14 counseling, whatever he needs, whatever he gets.
15 He's the type of individual, it doesn't matter.
16 Q. Did he get a divorce recently?
17 A. I don't know.
18 Q. Do you know?
19 A. I think he did separate from his wife.
20 Q. Do you know when they separated?
21 A. I don't have records. Once again, when

Page 63

1  George and I talk, I didn't have the records -- I
2  didn't write it down exactly what date and time,
3  this and that. On crisis counseling or ongoing,
4  if he sees me and I see him, we set dates. If I
5  can see him that date, if I see him a different
6  date, I could see George maybe twice a week, three
7  times -- I see George, we talk. He told me he has
8  some issues with his family.
9  Q. Do you know the year he got separated
10 or --
11 A. No. I don't recall.
12 Q. In your position in your family
13 counseling, would you agree or disagree that a
14 separation or divorce is a traumatic event in
15 one's life?
16 A. Yes.
17 Q. Is that something that you would expect
18 someone would discuss with you as your spiritual
19 counselor or as your secular counselor?
20 A. He did mention what he was going
21 through.

Page 64

1  Q. Is that something you spent time trying
2  to help him through?
3  A. Ongoing.
4  Q. It is still ongoing?
5  A. Not the focus.
6  Q. What's the focus?
7  A. The focus is what he is going through
8  now.
9  Q. And that's the stress related to the
10 incident?
11 A. The stress, right. I have known George
12 Banks for a while, and he's a man who is going
13 through a lot of experiences, so I didn't write
14 them down. I just counseled him.
15 Q. What are some of the experiences he has
16 done through?
17 A. When you say experiences, it's my
18 impression, being a person watching him, building
19 a business, still wanting to build his business,
20 but help the community. So it was a
21 conscious-minded person who wanted to help his

Page 65

1  community and build his business. He talked
2  about, you know, growing up, someone who didn't
3  have privileges like everyone else, but still
4  wanted to make something out of himself and help
5  his community.
6  Q. Did he have a bad childhood?
7  A. He was talking about he was orphaned,
8  someone raised him. Unfortunately I don't have
9  notes in front of me that I can go over every
10 year. It's been many years, but once again, what
11 really impressed me about George Banks is wanting
12 to help the ministry also, wanting to also say,
13 "Pastor, I'm praying for you," and I'm saying,
14 "Well, George, I'm praying for you." That kind of
15 support, working with the mentoring piece, coming
16 and talking to the young people, or I would send
17 someone up there to help him so he can talk to
18 about race and becoming an entrepeneur, those kind
19 of things he gave back to the community, as well
20 as being a man of integrity, which I always got
21 from George, which is, he wanted the best for

17 (Pages 62 to 65)

Page 74

1  Mr. Banks going. People who go through things
2  every natural person might go through, or extreme
3  things. He has that faith in God, he knows the
4  word of God says no matter what you been through,
5  you still can make it. That was my piece that
6  always let him know, no matter what you go
7  through, whether it's fair or unfair, you still
8  can make it.
9      Q. And so you give him largely spiritual
10 counseling of how to come over his lack of
11 self-esteem?
12     A. That's right.
13     Q. And then his mild depression, that's
14 what you diagnosed him with?
15     A. I diagnosed him going through mild
16 depression.
17     Q. When did you diagnose him with mild
18 depression?
19     A. I basically knew that George was going
20 through some things when I -- 2002, 2003, you
21 know. When you see someone who is struggling to

Page 75

1  go through things, he's basically trying to build
2  something by himself, you get lonely; you get
3  depressed; you get down. A severe depression is
4  when it's prolonged, inability to overcome or
5  manage the frustrations and the depression.
6  That's prolonged depression. That's something --
7  traumatic means that happened to you, that your
8  coping skills are not able to overcome, that has
9  been recently when I started seeing George after
10 that incident that George looked extremely
11 depressed at what happened.
12     Q. Well you said you diagnosed him with
13 mild depression. Have you diagnosed him with
14 severe depression?
15     A. I basically have seen George at a point
16 where I believe that when he told me that he was
17 seeing a psychiatrist, I agreed with that referral
18 that he made to me.
19     Q. And this was something he did recently,
20 though?
21     A. He did recently, right, because as he

Page 76

1  was coping with things, but when you go see a
2  psychiatrist, someone who can also prescribe, if
3  necessary, I don't know, if you need medication, I
4  don't have the credentials to talk about
5  medication. That's why I say, I'm happy that a
6  lot of people just disappear. George was
7  constantly -- that stress that he went through,
8  constantly he knew that maybe he did need
9  something else.
10     Q. Well I'm trying to figure out
11 whether -- did you ever diagnose him as anything?
12     A. Yes.
13     Q. What was your diagnosis?
14     A. My diagnosis is a person going through
15 mild depression, some post-traumatic stress
16 dealing with --
17     Q. So you're diagnosing him as having
18 post-traumatic stress disorder?
19     A. I'm diagnosing him as going through
20 post-traumatic stress disorder --
21     Q. Does he have -- I'm just trying to

Page 77

1  clarify. Earlier you testified you did not
2  diagnose him as having post-traumatic stress
3  disorder, but now you are saying you do?
4      A. Once again, are you talking about now,
5  or are you talking about when I first met George
6  Banks? You see, that's what confuses me.
7      Q. Now.
8      A. Now I diagnose George Banks as going
9  through mild depression -- depression, but mild
10 depression, someone who has been affected by a
11 traumatic event in his life, and post-traumatic
12 stress disorder means it's an event that's causing
13 him to not function properly. I'm saying that
14 George has experienced some type of post-traumatic
15 stress that has affected his ability to feel happy
16 as he was when I once knew him.
17     Q. Just to be clear, you're not diagnosing
18 him as having post-traumatic stress disorder?
19     A. No, I'm not going to give him
20 post-traumatic stress disorder.
21     Q. So your only diagnosis is mild

Page 78

1  depression secondary to the incident at the bank?
2      A.  And stress.
3      Q.  And stress. Would you say he suffered
4  any mild depression secondary to his marriage
5  collapsing?
6      A.  Did he suffer any -- I didn't see him
7  as being depressed without that.
8      Q.  So he suffered no mild depression --
9      A.  Mild depression means he can't get over
10 what is going on.
11     Q.  Mild depression is something you can't
12 get over?
13     A.  Mild depression is something you can
14 get over, can correct with counseling. I don't
15 have the diagnosis to diagnose someone who is
16 post-traumatic. There is a diagnostic test.
17 That's why he goes to the psychiatrist. The
18 psychiatrist has the credentials to make the
19 diagnosis.
20     Q.  But you can make the diagnosis for mild
21 depression. It's in your background to do that?

Page 79

1      A.  Yes, I can do that.
2      Q.  Is that based on your experience and
3  training?
4      A.  That's based on my experience and
5  training.
6      Q.  And the mild depression, what is your
7  opinion as to what is causing this mild
8  depression?
9      A.  Mild depression caused by the incident
10 that happened with them. If it prolongs any more,
11 that's why I'm glad he's seeing doctor --
12     Q.  So the incident at the bank, just to
13 clarify?
14     A.  At the bank was the issue that George
15 said was causing him to really evaluate -- think
16 about, you know, he wasn't as happy as he used to
17 be.
18     Q.  Are you coming up with this diagnosis
19 now or did you make this diagnosis earlier?
20     A.  I made that diagnosis earlier.
21     Q.  When?

Page 80

1      A.  When he first told me.
2      Q.  And when was that?
3      A.  Back in 2002, 2003, 2003.
4      Q.  Your first record is -- you testified
5  earlier he told you early July of 2003?
6      A.  2003.
7      Q.  So early July of 2003?
8      A.  Yes.
9      Q.  And what were some of your objective
10 findings to diagnose him with this?
11     A.  Consistently talking about how he felt
12 being not as happy as he used to be, not -- his
13 self-esteem was low, meaning that he didn't --
14 maybe the way he looked or something's wrong with
15 him, which he used to be very confident, even as
16 he went through things now, he was -- you know,
17 "Is there something wrong with me? What do I do,"
18 you know, those type of --
19     Q.  As a professional, did you consider
20 other sources that may be contributing to his
21 stress factor or his depression going on in his

Page 81

1  life?
2      A.  As a professional, yes, I always
3  considered that.
4      Q.  What were some of the conversations
5  that you made that may be affecting his --
6      A.  I didn't see any.
7      Q.  -- happiness.
8      A.  I didn't see any at that time because
9  George had already worked through the issues about
10 his marriage, and he talked to me about that and
11 he showed me that he was handling that, you know,
12 by continuing to, would effectively, continue to
13 come on his job, so he showed me. You see,
14 that's -- I don't have the information. So he
15 showed me signs he was working through that.
16     Q.  So signs of working through an issue
17 are returning to work?
18     A.  Communicating openly, honestly about
19 how you feel, being able to work effectively.
20     Q.  Is he working effectively now?
21     A.  I don't know. I don't know.